UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————

C H A B FIVE REALTY, LLC; GOLDEN
RAY, LLC; and EAGLE RIDGE ESTATES,
LLC,

                    Plaintiffs,

      -against-

TOWN OF MONROE; TOWN OF MONROE
TOWN BOARD; HARLEY DOLES, as Town
Supervisor; ANTHONY CARDONE, as Monroe
Town Boardmember and individually; RICHARD
COLON, as Monroe Town Boardmember;
MICHAEL McGINN, as a Monroe Town
Boardmember and individually; GERARD
McQUADE, JR., as Monroe Town Boardmember
and individually; and AUDRA SCHWARTZ, as
Town of Monroe Planning Board Chairperson,

                  Defendants.

———————————————————————

**FIRST AMENDED COMPLAINT
AND DEMAND FOR JURY TRIAL**

Case No.7:17-cv-07300 (NSR)(LMS)

      PLAINTIFFS C H A B FIVE REALTY, LLC ("CHAB Five"), GOLDEN RAY, LLC ("Golden Ray"), and EAGLE RIDGE ESTATES, LLC ("Eagle Ridge") (collectively "Plaintiffs"), by and through their attorneys Whiteman Osterman & Hanna LLP, as and for their Complaint in this matter, respectfully alleges as follows:

## INTRODUCTION

      1.     The Town of Monroe, supported by a community opposition group named United Monroe, is engaged in a long-standing campaign to exclude or substantially limit the Hasidic Jewish community from seeking housing in the Town.  Orange County has a significant shortage of available housing that could serve the needs of the Hasidic Jewish community. Yet, when developments are proposed and approved that could make housing available to the Hasidic

Jewish community, or any other willing purchaser, the Town Board of the Town of Monroe has taken drastic action to prevent their construction.

2.      Plaintiffs are the owners and developers of residential subdivision projects called Polak Farms, Shea Meadow, Rye Hill Estates, and Eagle Ridge Estates (collectively, the "Projects") on property located in the Town of Monroe (the "Town").  After long and arduous reviews by the Town Planning Board, the Polak Farms and Shea Meadow projects were granted final approvals to build much needed housing along what is known as the Rye Hill Corridor. Eagle Ridge Estates obtained preliminary subdivision approval and a SEQRA negative declaration was issued on Rye Hill Estates.

3.      In fact, the Town Planning Board concluded that Shea Meadow, Polak Farms, and Eagle Ridge Estates would be the most appropriate use of the project sites and fully complied with all Town zoning laws and the Town's comprehensive master plan.  The Planning Board also determined that there were no adverse environmental, social, and/or economic impacts that would result from the development of the Project Sites.  Yet, after granting various approvals for the projects, the Town has refused to permit the approved developments to proceed.

4.       The Town Board of the Town of Monroe ("Town Board") adopted a local law imposing a moratorium on the issuance of all permits and approvals for residential development and construction in the Town (the "Moratorium Law"), including for projects like Plaintiffs' that had received preliminary and final approvals.

5.      The intent of the moratorium, which was continuously extended in three-month increments six separate times was obvious.  If the Projects, and others that have been approved in the Town, are allowed to proceed, it would make available housing that could be purchased or occupied by the Hasidic Jewish community.  Indeed, revision to the Town's zoning laws to

prevent or substantially limit such housing was first on the list for the anti-Hasidic United Monroe upon election of its two candidates, Defendants Anthony Cardone and Michael McGinn, to the Town Board in November 2015.

6.      Only three months after the United Monroe-backed Town Board members took office, they began to fulfill their campaign promise to "Take Back Our Town" from what they call the "Kiryas Joel Power Elite" and the Hasidic Jewish community by adopting a patently illegal and discriminatory moratorium indefinitely barring any residential development in the Town.

7.      The Town Board even applied the Moratorium Law to the Projects that had recently been approved by the Planning Board and whose developers were actively proceeding to satisfy the conditions of the approvals and/or actively constructing the very improvements and environmental mitigation measures mandated in those final approvals.  That is not only illegal, but it makes absolutely no sense whatsoever. The Orange County Planning Department recognized the patently illegal nature of the Moratorium and, before the Moratorium Law was enacted, it advised the Town Board against imposing the Moratorium on projects that had been granted final approvals.

8.      The Town Attorney even acknowledged that a virtually identical moratorium that he drafted for an adjoining municipality was overbroad and unenforceable. The Town, nevertheless, persists in its discriminatory campaign against Plaintiffs and the Hasidic Jewish community.

9.      Plaintiffs tried on multiple occasions to avoid this litigation by strongly advising the Town Board during public hearings on the Moratorium Law and in meetings prior to this suit

that adoption and application of the Moratorium to Plaintiffs' Projects unlawfully violated Plaintiffs' constitutionally protected vested rights.

10.     Even though Plaintiffs knew the exercise was highly likely to be futile, Plaintiffs Golden Ray and CHAB Five in good faith still sought an exemption/variance from the Moratorium law from the Town Board (the "Exemption/Variance Applications"[1]) for their respective projects.

11.     Not a single document or any evidence of any kind was submitted in opposition to Plaintiffs' Exemption/Variance Applications for the Projects.  The Town Board nevertheless denied the Exemption/Variance Applications without discussion and without making any findings of fact or conclusions of law.

12.     The Town did not even inform Plaintiffs that their Exemption/Variance Applications had been denied.   Instead, on the night that it denied Plaintiffs' Exemption/Variance Applications, the Town Board denied all five exemption/variance applications that were pending before it without any public discussion, making any findings of fact or conclusions of law, or stating any basis to support any of the denials.  The Town Board did not even announce the standard of review it applied to deny every exemption/variance application before it.

13.     The Town Board then doubled-down in its pursuit to exclude the Hasidic Jewish community from Monroe by amending an accessory apartment law to allow only homes that have been owner-occupied for more than 10 years to apply for a small accessory apartment.  The Town Board, however, granted itself the arbitrary and unlimited discretion to waive the 10-year

---

[1]     The applications are referred to as the Exemption/Variance Applications because the Town Attorney referred to the application as both an exemption and variance.  That terminology is also used in the Moratorium Law.

waiting period, but only for accessory apartments that would be occupied by an elderly or disabled relative, and no others.

14.     On November 20, 2017, the Town Board adopted an amendment to Chapter 57 of the Town of Monroe Town Code (the "Zoning Law") by Local Law No. 6 of 2017 (the "Zoning Law Amendments").   The Zoning Law Amendments will require property owners, such as Plaintiffs, to get new approvals for already approved projects and will result in significant additional restrictions and changes to the approved projects.

15.     The Zoning Law Amendments significantly reduce the permitted density in residential areas of the Town and restrict those areas where multi-family housing may be constructed.  In fact, under the new zoning, the number of homes Plaintiffs will be permitted to construct will be significantly reduced from what was originally approved, and Plaintiffs will need to comply with additional, newly imposed, and restrictive requirements prior to obtaining site plan approvals.

16.     These were just a few of the many actions that have violated Plaintiffs constitutional rights and violated the precepts of the United States and New York Constitutions barring religious discrimination.  Having no other recourse, Plaintiffs have been compelled to commence this litigation.

## SUMMARY OF CLAIMS

17.     This litigation challenges the Town's use of the invalid Moratorium Law and adoption of the Zoning Law Amendments to thwart Plaintiff's approved projects, in all practical effect, and make housing unavailable to the Hasidic Jewish community. Under settled and binding decisional law of the New York Court of Appeals and the Appellate Division, Second Department, and the United States and New York Constitutions, the only legitimate basis for

adoption of a moratorium is in response to an emergency or crisis, or while a specific proposed amendment to a municipality's comprehensive plan or land use laws has been proposed and is going through the review process.

18. No emergency was referenced in the Moratorium Law and none existed. No amendment to the Town's Comprehensive Master Plan ("CMP") or land use laws was proposed before the Moratorium was enacted.

19. The Moratorium was extended *six* separate times, and was in effect for approximately 18 months, before the Town even proposed any changes to its zoning law. After the Moratorium was extended six separate times, the Town enacted changes to the Zoning Law to drastically reduce the approved density of Plaintiffs' projects.

20. The Moratorium Law stated that it had been enacted to freeze all significant residential development — even approved projects — while the Town "studied" its CMP and zoning law. That is not a permissible basis or justification for a moratorium, however. The Moratorium Law was, therefore, facially invalid when it was adopted.

21. This litigation also challenges the Moratorium Law as it was applied to Golden Ray. Golden Ray spent $2,810,000 for the acquisition of the Shea Meadow Site and spent an additional $150,000 toward completing the Shea Meadow project improvements. Currently, the only remaining actions to be had by the Town Board and the Planning Board to accomplish the filing of the approved subdivision map are essentially administrative.

22. The Moratorium Law deprived Golden Ray of its constitutionally protected and vested rights by prohibiting issuance of even the most minor ministerial permits and approvals by Town officials and boards.

6

23.     This prevented Golden Ray from completing the improvements and mitigation measures identified in the Shea Meadow Conditional Final Approval and proceeding to build its approved residential subdivision project.

24.     After acquiring title to the Shea Meadow Site, Golden Ray obtained a permit from the Town authorizing Golden Ray to cut and remove trees from the Shea Meadow Site, which marked the commencement of construction of the Project Improvements identified and/or referenced in the Shea Meadow Conditional Final Approval.  That work was commenced and completed before the Moratorium was adopted.  But the Town barred construction and installation of site improvements and mitigation measures (collectively referred to as "Project Improvements") from continuing because the Moratorium prohibited the issuance of all ministerial approvals and permits relating to the Shea Meadow construction prior to the adoption of the Zoning Law Amendments.

25.     On November 20, 2017 – 19 months after adopting the Moratorium Law – the Town passed the Zoning Law Amendments.  The Zoning Law Amendments reduce the lot count for Golden Ray's property to a maximum of 28 building lots, an elimination of 18 of the total 46 building units approved in the Shea Meadow Conditional Final Approval and impose additional restrictions not contained in the prior approval.

26.     The Moratorium and the changes to the Zoning Law are null and void as applied to Golden Ray and Shea Meadow because they unlawfully deprive Golden Ray of its vested property rights in violation of the Due Process Clauses of the United States and New York State Constitutions.

27.     This litigation also challenges the Moratorium Law and Zoning Law Amendments as applied to CHAB Five's Polak Farms project.  CHAB Five spent $3,000,000 for the

acquisition of the Polak Farms Site. Currently, the only remaining actions to be had by the Town Board and the Planning Board to accomplish the filing of the approved subdivision map are essentially administrative.

28.     The Moratorium Law deprived CHAB Five of its constitutionally protected and vested rights by prohibiting issuance of even the most minor ministerial permits and approvals by Town officials and boards.

29.     This prevented CHAB Five from completing the improvements and mitigation measures identified in the Polak Farms Final Approval and proceeding to build its approved residential subdivision project.

30.     In addition, the Zoning Law Amendments impose additional restrictions not contained in the prior approval on CHAB Five's Polak Farms property.

31.     The Moratorium and the changes to the Zoning Law are null and void as applied to CHAB Five and the Polak Farms Project because they unlawfully deprive CHAB Five of its vested property rights. This unlawful deprivation of vested property rights violates the Due Process Clauses of the United States and New York State Constitutions.

32.     This litigation also challenges the Moratorium as applied to CHAB Five's Rye Hill Estates project. CHAB Five spent $550,000 for the acquisition of the Rye Hill Estates Site.

33.     The Moratorium deprived CHAB Five of its constitutionally protected and vested rights by prohibiting it from obtaining final approval from the Planning Board, and proceeding to build its residential subdivision project.

34.     The Zoning Law Amendments impose additional restrictions on the Rye Hill Estates Site that did not exist when the subdivision application was submitted or the SEQRA Negative Declaration was issued.

35.     The Moratorium and the changes to the Zoning Law are null and void as applied to CHAB Five and the Rye Hill Estates Project because they unlawfully deprive CHAB Five of its vested property rights in violation of the Due Process Clauses of the United States and New York State Constitutions.

36.     This litigation also challenges the Moratorium Law as applied to Eagle Ridge. Eagle Ridge expended significant funds for the acquisition of the Eagle Ridge Estates Site. Currently, the only remaining actions to be had by the Town Board and the Planning Board to accomplish the filing of the approved subdivision map are essentially administrative.

37.     The Moratorium Law deprived Eagle Ridge of its constitutionally protected and vested rights by prohibiting it from obtaining final approval from the Planning Board, completing the improvements and mitigation measures identified in the Eagle Ridge Estates Preliminary Approval, and proceeding to build its residential subdivision project.

38.     The Zoning Law Amendments reduce the lot count for Eagle Ridge's property to a maximum of 23 building lots, an elimination of 17 of the total 40 building units approved in the Eagle Ridge Estate Preliminary Approval and impose additional restrictions not contained in the prior approval.

39.     The Moratorium and the changes to the Zoning Law are null and void as applied to Eagle Ridge and the Eagle Ridge Estates Project because they unlawfully deprive Eagle Ridge of its vested property rights in violation of the Due Process Clauses of the United States and New York State Constitutions.

40.     Plaintiffs Golden Ray and CHAB Five filed with the Town Board Exemption/Variance Applications under the Moratorium Law. Plaintiffs submitted hard dollars and cents proof confirming their vested rights, as well as confirming that they suffered severe

economic hardship and no ability to use their property in any economically productive fashion while the Moratorium was in effect. No evidence was submitted in opposition to the Exemption/Variance Applications, and no Town official or consultant submitted any report or analysis in opposition to the Exemption/Variance Applications.

41.     Without any discussion, without making any findings of fact, and without stating any conclusions of law, the Town Board arbitrarily, capriciously, and contrary to law denied the Exemption/Variance Applications.

42.     Although the Town Board was informed that a denial of the Exemption/Variance Applications would constitute a knowing and intentional abrogation of Plaintiffs' and all other similarly situated property owners' constitutionally protected vested rights and would subject Town Board members who voted to deny the Exemption/Variance Applications to both official and individual liability for damages and attorney's fees, pursuant to 42 U.S.C. §§ 1983 and to 1988, the Town Board, nevertheless, denied the Exemption/Variance Applications.

43.     The arbitrary and capricious denial of the Exemption/Variance Applications and the unlawful deprivation of Plaintiffs' vested rights violate the Due Process Clauses of the United States and New York State Constitution. The Town Boardmembers voting for denial knowingly and intentionally violated Plaintiffs' due process rights under the United States Constitution.

44.     Indeed, the Moratorium Law, *inter alia*: (a) prevented the Town Planning Board from granting final subdivision approval to Eagle Ridge; (b) prevented the Town of Monroe Planning Board Chairperson (the "Planning Board Chair") from signing the Shea Meadow and Polak Farms approved subdivision plats; (c) prevented the Town Board from approving the Public Improvement Security Agreement (the "PISA"), a routine financial security agreement

mandated by the Town Code and prepared by the Town Attorney with respect to securing Golden Ray's, CHAB Five's, and Eagle Ridge's obligations to construct required public improvements; (d) prevented the Town Board from approving a bank-issued letter of credit or other form of financial security required by the Town Code to further secure Golden Ray's, CHAB Five's, and Eagle Ridge's obligations; and (e) prevented the Town from issuing other permits necessary or incidental to Golden Ray, CHAB Five, and Eagle Ridge proceeding with construction work of the Project Improvements.  There was neither a lawful nor discretionary basis for the Town's boards and officials to refuse to issue the foregoing non-discretionary permits and approvals.

45.     The Zoning Law Amendments impose a number of restrictions on Plaintiffs that will prevent the Projects from being constructed in accordance with the Approvals.  These changes include significantly reducing the lot counts for the Project Sites, as well as requiring the preparation of three new, separate, subdivision plans for each Project prior to the Planning Board making a determination on what type of subdivision applications Plaintiffs will even be permitted to pursue.

46.     Plaintiffs respectfully demand that this Court, *inter alia*:

(a)     declare the Moratorium Law unlawfully deprived Plaintiffs' of their vested property rights, as applied;

(b)     declare that the Zoning Law Amendments are invalid and unlawful on their face;

(c)     declare that the Zoning Law Amendments unlawfully deprived Plaintiffs of their vested property rights, as applied;

(d)     declare the Town's amendment to the Accessory Apartment Law invalid and unlawful on its face;

(e)     issue an injunction compelling the Town to issue the ministerial approvals and undertake the ministerial actions needed to enable Plaintiffs to construct and install Town Planning Board mandated infrastructure, mitigation measures and on-site and off-site Projects improvements, specifically including: (i) approval of the PISAs and Letter of Credits for CHAB Five, Golden Ray, and Eagle Ridge; (ii) approval of the Eagle Ridge final subdivision plat by the Town Planning Board; (iii) signing of the Approved Final Plats for Shea Meadow, Polak Farms, and Eagle Ridge Estates by the Town Planning Board Chair; and (iv) issuance of land disturbance, clearing, and any other ministerial permits required for such construction and installation;

(f)     award Plaintiffs damages against all Defendants, except the Town Planning Board Chair, for the losses caused and expenses incurred by Plaintiffs arising from and in connection with the adoption of the Moratorium Law, its application to Plaintiffs and the Projects, the denial of the Exemption/Variance Applications, the unlawful interference with and deprivation of Plaintiffs' vested constitutional rights, and the preclusion of Town officials and boards from issuing ministerial permits and approvals to which Plaintiffs are entitled, in an amount to be proven at trial;

(g)     reasonable attorneys' fees, costs and expenses of this litigation;

(h)     and such other relief as the Court deems appropriate.

## PARTIES

47.     C H A B FIVE REALTY, LLC is a limited liability corporation organized and existing under the laws of the State of New York, with its principal place of business located at 269 Mountainview Drive, No. 102, Monroe, New York.

48.     GOLDEN RAY, LLC, is a limited liability corporation organized and existing under the laws of the State of New York, with its principal place of business located at 269 Mountanview Drive, No. 102, Monroe, New York.

49.     EAGLE RIDGE ESTATES, LLC, is a limited liability corporation organized and existing under the laws of the State of New York, with its principal place of business located at 269 Mountainview Drive, No. 102, Monroe, New York.

50.     The TOWN OF MONROE is a township in Orange County, New York duly organized and lawfully existing under the Laws of the State of New York. The Town's administrative offices are located at 1465 Orange Turnpike, Monroe, New York 10950.

51.     The TOWN BOARD OF THE TOWN OF MONROE is the governing body of the Town. Its administrative offices are located at 1465 Orange Turnpike, Monroe, New York 10950.

52.     HARLEY DOLES is the duly elected Town Supervisor and member of the Town Board. His address as Town Supervisor and Town Boardmember is 1465 Orange Turnpike, Monroe, New York 10950. He is being sued in his official capacity.

53.     ANTHONY CARDONE is a duly elected Town Boardmember. His address as Town Boardmember is 1465 Orange Turnpike, Monroe, New York 10950. He is being sued in his individual and official capacities.

54.     RICHARD COLON is a duly elected Town Boardmember. His address as Town Board member is 1465 Orange Turnpike, Monroe, New York 10950. He is being sued in his official capacity.

55.     MICHAEL McGINN is a duly elected Town Boardmember. His address as Town Boardmember is 1465 Orange Turnpike, Monroe, New York 10950. He is being sued in his individual and official capacities.

56.     GERARD McQUADE, JR. is a duly elected Town Boardmember. His address as Town Boardmember is 1465 Orange Turnpike, Monroe, New York 10950. He is being sued in his individual and official capacities.

57.     AUDRA SCHWARTZ is the duly appointed Chairperson of the Town Planning Board. Her address as Town Planning Board Chairperson is 1465 Orange Turnpike, Monroe, New York 10950. She is being sued in her official capacity and solely because this lawsuit demands that this Court order the Planning Board Chair to sign the Project's approved final subdivision plat.

## JURISDICTION AND VENUE

58.     This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 1331 and 42 U.S.C. § 1441.

59.     Venue is properly laid in this District pursuant to 42 U.S.C. § 1391(b)(1), (2).

## FACTUAL BACKGOUND

**A.     The Approved Shea Meadow Project is a 46 lot residential subdivision located within the Town.**

60.     The Shea Meadow Site is a 46.5 +/- acre tract of land.  The Shea Meadow Site is located along Rye Hill Road and consists of the lands within Section 31, Block 1, Lots 11.1 and 11.2 in the Town.

61.     In order for the Shea Meadow Site to be subdivided into 46 residential building lots, a subdivision approval and other related land use approvals were required for the Shea Meadow Project from the Planning Board.  All of these approvals have been obtained and a Conditional Final Approval was issued by the Planning Board.  A copy of the Shea Meadow Conditional Final Approval is attached hereto as **Exhibit A** and incorporated herein by reference.

62.     Shea Meadow was the culmination of nearly 30 years of rigorous review of Shea Meadow by the Planning Board and other governmental agencies / boards, including the Town Board.

63.     In 1985, an application was made to the Planning Board to subdivide the project site into 49 residential building lots, with a 50th lot reserved for the existing farmstead on the site.

64.     In connection with its review of the Shea Meadow subdivision application, the Planning Board conducted a full environmental review of Shea Meadow pursuant to the requirements of the New York State Environmental Quality Review Act ("SEQRA"), which review included examination of relevant areas of environmental concern.

65.     On or about May 12, 1986, in connection with the Shea Meadow subdivision application, the Town Planning Board declared that the proposed 49-lot subdivision would not result in any unmitigated adverse environmental impacts, and a SEQRA Negative Declaration was issued.

66.     On or about July 8, 1986, the Planning Board preliminarily approved the subdivision, and then granted the final subdivision plat approval on or about February 12, 1989.

67.     When the approved 49 lot subdivision was not immediately built, a revised approval was sought for the Shea Meadow project.

68.     As far back as 1986, the Town knew that the Shea Meadow Site would be developed into a sizeable residential subdivision.  Upon information and belief, the Town took this fact into account when it revised its Comprehensive Plan and Zoning Laws over the years following the 1986 approval.

69.     Approval of a revised project was sought in or around 2002.

70.     At that time, the Project was made part of the Rye Hill Generic Environmental Impact Study ("Rye Hill GEIS") to identify and address impacts associated with five other residential developments that were also proposed along Rye Hill Road in the Town, which has been called the "Rye Hill Road Corridor."

71.     The Rye Hill GEIS addressed the potential adverse environmental impacts of the six residential subdivisions proposed in the Rye Hill Road Corridor.  In particular, the Town Planning Board's SEQRA review examined:

     a.   Groundwater Impacts;

     b.   Surface Water Impacts;

     c.   Traffic Impacts (including a traffic study of the relevant area); and

     d.   Planning & Zoning Impacts.

72.     On or about April 20, 2004, a Generic SEQRA Finding Statement (2004 Findings Statement) was adopted by the Planning Board. See **Exhibit B**.  The 2004 Findings Statement addressed the common impacts associated with the six projects within the Rye Hill Road Corridor and concluded all identified impacts would be adequately minimized or mitigated to the extent practicable by incorporating certain mitigation measures into the development of the Shea Meadow Site ("Mitigation Measures").  The Mitigation Measures were incorporated into the Conditional Final Approval of the Shea Meadow project.

16

73.     The Town proposed revisions to its Comprehensive Plan in 2005, which were adopted in 2008.  Upon information and belief, these revisions took into account the land use applications then pending before the Planning Board, including the residential subdivisions that were proposed for the six separate projects analyzed in the Rye Hill GEIS, including Plaintiffs' projects.

74.     The Shea Meadows development was ultimately revised to a 46-lot cluster subdivision.

75.     After the Planning Board and its planning and engineering consultants reviewed the proposed cluster subdivision and required revisions and refinements thereto, the Planning Board was satisfied that Shea Meadow conformed to all applicable zoning laws and would create no adverse environmental impacts.

76.     The Town Planning Board, therefore, adopted the Preliminary Approval for the project on March 12, 2013.  See **Exhibit C**.

77.     In the Preliminary Approval adopted by the Planning Board on March 12, 2013, the Planning Board stated the following as the benefits of the proposed cluster subdivision:

> The project was most recently redesigned as a forty-six (46) lot *cluster* subdivision.  The project continues to propose service by central sewers in Orange County Sewer District #1 and central water supplied by the Village of Monroe. The cluster subdivision layout allows the project to achieve the same 46 single family residential lots, while greatly reducing the required impervious area and preserving approximately 25± acres of the total 46.6± acre lot as open space proposed to be dedicated to the Town of Monroe, or to be included in a home owners association and encompassed with a conservation easement.

*See* **Exhibit C**, at 4.

78.     In connection with issuing the Preliminary Approval of Shea Meadow, the Planning Board also determined:

[A]pproval of the Site Plan and Special Permit *will substantially serve the public convenience, safety and welfare; will not be detrimental to the neighborhood or the residents thereof*; and will not otherwise be detrimental to the public convenience or welfare, subject to compliance in full with conditions hereinafter imposed . . . .

[T]he arrangement, location, and width of streets, their relation to the topography of the land, water supply, sewage disposal, drainage, lot sizes and arrangement, *the possible future development of adjoining land as yet un-subdivided are all appropriate and consistent with the requirements of the master plan, the official map, the Town of Monroe Subdivision Regulations and applicable zoning regulations*, subject to compliance with conditions hereinafter imposed.

[T]his cluster subdivision promotes flexibility of design and development of land and *constitutes the most appropriate use of land* and facilitates the adequate and economical provision of streets and utilities and preserves the natural and scenic qualities of open land . . . .

**Exhibit C**, at 6-7 (emphasis added).

79.     After the Planning Board granted the Preliminary Approval, the then-proponent of Shea Meadow went about securing other approvals, permits, etc. from other governmental agencies, and, in the course of doing so, the details of Shea Meadow were further refined so it would be made ready to obtain final or conditional final approval from the Planning Board.

80.     The Shea Meadow Preliminary Approval was a significant milestone because the Planning Board cannot modify or reject a final plat that conforms to a subdivision plat that received preliminary approval:

[Preliminary approval] was intended to fix the broad outlines of the proposed development so that the developer could know where it stood before incurring additional expenses associated with the preparation of the detailed plans involved in final approval . . . . it has even been held that, absent new information, a subsequent modification or rejection of a preliminarily approved subdivision layout is an arbitrary and capricious act subject to invalidation. Preliminary plat procedures and default provisions would lack significance if they were subject to nullification as the result of mere change of heart by the planning body.

Matter of Sun Beach Real Estate Dev. Corp. v Anderson, 98 AD2d 367, 373-74 (2d Dept 1983) (citations omitted), affd, 62 NY2d 965 (1984) (internal citations omitted).

81.     On or about August 12, 2014, the Planning Board adopted a resolution entitled: "Resolution of Approval – Subdivision, Site Plan, Local Wetlands Disturbance Permit and Special Permit for GOLDEN RAY, LLC [the Shea Meadow]" (the "Shea Meadow Conditional Final Approval").

82.     The Town Planning Board confirmed in the Conditional Final Approval its prior determination that:

> [A]pproval of the Site Plan and Special Permit will substantially serve the public convenience, safety and welfare in that the lad to be subdivided is of such character that it can be used safely for building purposes without danger to health of peril from fire, flood or other menace.
>
> Further, the arrangement, location and width of streets, their relation to the topography of the land, water supply, sewage disposal, drainage, lot sizes and arrangement, the possible future development of adjoining land as yet un-subdivided are all appropriate and consistent with the requirements of the master plan, the official map, the Town of Monroe Subdivision Regulations and applicable zoning regulations, subject to compliance in full with conditions hereinafter imposed.

*See* Exhibit C, at 6.

83.     In reliance upon the Shea Meadows Conditional Final Approval, and the fact that a SEQRA Negative Declaration had been adopted and reaffirmed by the Planning Board, Golden Ray bought the Shea Meadow project at a cost of $2,810,000.

84.     Also in reliance upon the Shea Meadow Conditional Final Approval, and the fact that a Negative Declaration had been adopted by the Planning Board, Golden Ray and its predecessor-in-title undertook the process of satisfying and/or fulfilling the conditions and requirements stated in the Shea Meadow Conditional Final Approval.

85.     All of said conditions and/or requirements were satisfied by Golden Ray and/or its predecessor in title, except conditions and/or requirements which the Town prevented Golden Ray from satisfying and/or fulfilling.

86.     Upon information and belief, the Town's obstructed Golden Ray's efforts to satisfy the conditions of the final subdivision approval to prevent Shea Meadow from being built.

87.     Golden Ray also obtained numerous other agency approvals for the Shea Meadow project, including the following (referred to as "Table A"):

| Agency | Approval Required | Approval Obtained | Approval Expiration |
|---|---|---|---|
| Orange County Health Department | Realty Subdivision Approval | June 16, 2014 | June 16, 2019 |
| Orange County Health Department | Water Main Extension Approval | June 16, 2014 | June 16, 2019 |
| Village of Monroe | Village Board Approval for Water Supply | Meeting Minutes of June 16, 2013 | No Expiration Specified |
| Village of Monroe | Village Engineer Approval for tap to Village Main and location of new 16" water main | Orange County Health Department Application Signed by Village Public Works Superintendent on November 8, 2013 | No Expiration Specified |
| NYS DEC | Sewer Main Extension Approval | April 4, 2014 | April 4, 2019 |
| NYS DEC | SPDES Stormwater Notice of Intent | Request condition to Final Approval to file closer to time of construction | Pending MS4 Signature by Town of Monroe |
| Monroe Town Board | Drainage District | Submitted to Town Board, Public Hearing Scheduled for July 30, 2014 | No Expiration |
| Monroe Town Board | Extension of Water District | Meeting Minutes of October 17, 2013 | No Expiration |
| Orange County Department of Environmental Facilities | Sewer Main Extension and Individual Sewer Connections | November 8, 2013 | Runs parallel with DEC Approval |

88.     Before the Moratorium was enacted, the Shea Meadow final subdivision plat was ready for signature by the Chairperson of the Planning Board, except for the outstanding satisfaction of two conditions that the Town Board refused to act on: (1) approval and execution

20

of a PISA between Golden Ray and the Town and (2) posting financial security with the Town for the Project Improvements.

89.     The Town obstructed and frustrated Golden Ray's efforts to satisfy these two conditions, ostensibly so the Town could enact the Moratorium Law and thwart development of the Shea Meadow project.

90.     Golden Ray also obtained a permit from the Town to clear trees and vegetation from the Shea Meadow Site, so it could proceed with construction and installation of the Project Improvements.  It completed the required tree and vegetation removal.

91.     Golden Ray also engaged Gardiner S. Barone, Esq., a local attorney, to negotiate and enter the PISA with the Town and to assist in the posting of financial security reasonably required by the Town, so the final subdivision plat would be signed by the Chairperson of the Planning Board and filed with the Orange County Clerk. Golden Ray could not enter into a PISA with the Town because the attorney for the Town never approved of the PISA for Shea Meadow in spite of Golden Ray's efforts.

92.     Since the Shea Meadow Conditional Final Approval was issued in 2014, and significant steps have been taken to progress development of the project, Golden Ray has a legitimate expectation that it will be able to build the approved 46-lot subdivision.

**B.     The Approved Polak Farms Project is a 49-lot residential subdivision located within the Town.**

93.     The Polak Farms Site is a 150.4+/- acre tract of land.  The Polak Farms Site is located along Rye Hill Road and consists of the lands within Section 31, Block 1, Lots 31, 62 & 63 in the Town.

94.     In order for the Polak Farms Site to be subdivided into 49 residential building lots, a subdivision approval and other related land use approvals were required for Polak Farms

21

from the Planning Board and other agencies.  All of these approvals have been obtained, except as noted herein, and a Final Approved Plat was issued by the Planning Board.  A copy of the Polak Farms Final Approval is attached as **Exhibit D**.

95.     As documented in the Polak Farms Final Approval, an application was filed with the Planning Board on July 26, 2001 to subdivide the Polak Farms Site into 50 lots for residential development.

96.     In connection with its review of an application to subdivide the Polak Farms Site, the Planning Board conducted a full SEQRA review of Polak Farms, which examined relevant areas of environmental concern.

97.     On or about June 4, 2001, in connection with the Subdivision Application for the 49 Lot Subdivision, the Town Planning Board determined that the proposed 49 lot subdivision would not result in any unmitigated adverse environmental impacts and issued a SEQRA Negative Declaration.

98.     Accordingly, as far back as 2001, the Town was aware that the Polak Farms Site would be developed into a sizeable residential subdivision.  Upon information and belief, the Town took this fact into account and planned accordingly in connection with its development and revision of its Comprehensive Plan and Zoning Laws.

99.     In or about 2002, development of the proposed Polak Farms project was made part of the Rye Hill GEIS, which as described above identified and evaluated potential adverse environmental impacts associated with five other large scale residential developments proposed along the Rye Hill Road Corridor.

100.    The Comprehensive Master Plan adopted by the Town in 2008 identifies Polak Farms as one of a number of large-scale residential projects within the Rye Hill Corridor that was then being considered by the Planning Board.

101.    On or about January 13, 2015, the Planning Board adopted a resolution entitled: "Resolution of Approval – Preliminary and Final Subdivision – Phases I & II – Local Wetlands Disturbance Permit for Rye Hill Holdings, LLC [Polak Farms]" (the "Polak Farms Final Approval").

102.    The Town Planning Board made the following determination in the Polak Farms Final Approval that:

> [A]pproval of this subdivision will substantially serve the public convenience, safety and welfare in that the land to be subdivided is of such character that it can be used safely for building purposes without danger to health of peril from fire, flood or other menace.
>
> Further, the arrangement, location and width of streets, their relation to the topography of the land, water supply, sewage disposal, drainage, lot sizes and arrangement, the possible future development of adjoining land as yet un-subdivided are all appropriate and consistent with the requirements of the master plan, the official map, the Town of Monroe Subdivision Regulations and applicable zoning regulations, subject to compliance in full with conditions hereinafter imposed.

*See* Exhibit D, at 6

103.    In reliance upon the Polak Farms Final Approval, and the fact that a SEQRA Negative Declaration had been adopted by the Planning Board, CHAB Five bought the Polak Farms project at a cost of $3,000,000.

104.    Also in reliance upon the Polak Farms Final Approval, and the fact that a Negative Declaration had been adopted by the Planning Board, CHAB Five and its predecessor-in-title undertook the process of satisfying and/or fulfilling the conditions and requirements stated in the Polak Farms Final Approval.

23

105.    CHAB Five and its predecessor-in-title satisfied all of the conditions of the final subdivision approval for the Polak Farms project, except those that the Town prevented CHAB Five from satisfying. Upon information and belief, the Town obstructed CHAB Five's efforts to satisfy the conditions to prevent Polak Farms from being built.

106.    CHAB Five also obtained numerous other agency approvals for the Polak Farms project, including the following (referred to as "Table B")

| Agency | Approval Required | Approval Obtained |
|---|---|---|
| **Phase I** | | |
| Village of Monroe | Watershed Variance (Lot 4 Sewage Disposal System Location) | February 23, 2006 |
| Orange County Health Department | Realty Subdivision Approval | June 23, 2006 |
| Town of Monroe Planning Board | Final Subdivision Approval & Local Wetlands Disturbance Permit | January 13, 2015 |
| **Phase II** | | |
| Orange County Department of Health | Realty Subdivision Approval | October 18, 2013 |
| Orange County Sewer District No. 1 | Sanitary Sewer Main Line Extension | August 22, 2011 |
| NYS DEC | Sewer Main Extension | August 22, 2013 |
| Town of Monroe Planning Board | Final Subdivision Approval & Local Wetlands Disturbance Permit | January 13, 2015 |
| **Overall Project** | | |
| United States Army Corps of Engineers | Nationwide Permit and Wetland Mitigation Plan Approval | May 29, 2008 |
| NYS DEC | SPDES General Stormwater Discharges General Permit | May 22, 2011 |
| Town of Monroe Town Board | Drainage District Formation & Dedication of Open Space | Pending Submission to Town Board |

107.    CHAB Five also engaged Gardiner S. Barone, Esq. to negotiate and enter the PISA with the Town and to assist in the posting of financial security reasonably required by the Town, so the final subdivision plat for Polak Farms would be signed by the Chairperson of the Planning Board and filed with the Orange County Clerk. CHAB Five could not enter into a PISA

24

with the Town because the attorney for the Town never approved of the PISA for Polak Farms in spite of CHAB Five's efforts.

108.     Since the Final Approval was issued in 2015, and significant steps have been taken to progress development of the project, CHAB Five has a legitimate expectancy that it will be able to build the 46-lot subdivision.

**C.     The Rye Hill Estates Project is a residential subdivision located within the Town.**

109.     The Rye Hill Estates Site is a 20.98 +/- acre tract of land.  The Rye Hill Estates Site is located along Rye Hill Road and consists of the lands within Section 31, Block 1, Lot 29 in the Town.

110.     In order for the Rye Hill Estates Site to be subdivided into 10 residential building lots, a subdivision approval and other related land use approvals were required for the project from the Planning Board and other agencies.  The applications for land use approvals had substantially progressed, and a SEQRA negative declaration was issued by the Planning Board, before the Moratorium Law halted all progress on the project.

111.     In particular, an application was filed with the Planning Board to subdivide the Rye Hill Estates Site into 10 lots for residential development and the Planning Board approved a sketch plan for a cluster development on June 11, 2013.  An updated set of plans was submitted in August 2015, and the Planning Board held a public hearing on the project on March 8, 2016.

112.     In connection with its review of an application to subdivide the Rye Hill Estates Site, the Planning Board conducted a SEQRA review of Rye Hill Estates, which examined relevant areas of environmental concern.

113.    The Town Planning Board adopted a Declaration that the proposed 10 lot subdivision would not result in any adverse environmental impacts, and thus issued a SEQRA Negative Declaration.

114.    Accordingly, as far back as 2001, the Town was aware that the Rye Hill Estates Site would be developed into a residential subdivision.  Upon information and belief, the Town took this fact into account and planned accordingly in connection with its development and revision of its current Comprehensive Plan and Zoning Laws.

115.    In reliance upon the Rye Hill Estates sketch plan approval for a cluster subdivision, and the fact that a SEQRA Negative Declaration had been adopted by the Planning Board, CHAB Five bought the Rye Hill Estates project at a cost of $550,000.

116.    Also in reliance upon the cluster development sketch approval and the Negative Declaration, CHAB Five and its predecessor-in-title undertook the process of satisfying the conditions and requirements to obtain subdivision approval.

117.    A public hearing on the Rye Hill Estates project was held on March 8, 2016.

118.    CHAB Five and its predecessor-in-title satisfied all of the conditions of obtaining preliminary subdivision approval, except those that the Town prevented CHAB Five from satisfying.  Upon information and belief, the Town obstructed CHAB Five's efforts to obtain subdivision approval for Rye Hill Estates to prevent Rye Hill Estates from being built.

119.    Since the SEQRA negative declaration was issued for the Rye Hill Estates project, CHAB Five was unlawfully foreclosed from obtaining preliminary and final approvals for and progressing the subdivision project by the illegal Moratorium Law prior to the adoption of the Zoning Law Amendments, and has a legitimate expectancy that it will be able to build the subdivision.

**D.    The Eagle Ridge Estates Project is a residential subdivision located within the Town.**

120.    The Eagle Ridge Estates Site is a 44.7 +/- acre tract of land.  The Eagle Ridge Estates Site is located along Rye Hill Road and consists of the lands within Section 31, Block 1, Lot 2.4 in the Town.

121.    In order for the Eagle Ridge Estates Site to be subdivided into 42 residential building lots, a subdivision approval and other related land use approvals were required for Eagle Ridge Estates from the Planning Board and other agencies.  All of these approvals have been obtained, except as noted herein, and a preliminary subdivision approval was issued by the Planning Board.

122.    As documented in the Eagle Ridge Estates Preliminary Approval, an application was filed with the Planning Board to subdivide the Eagle Ridge Estates Site into 42 lots for residential development.

123.    In connection with its review of an application to subdivide the Eagle Ridge Estates Site, the Planning Board conducted a full SEQRA review of Eagle Ridge Estates, which examined relevant areas of environmental concern.

124.    The Town Planning Board adopted a Declaration that the proposed 42 Lot Subdivision would not result in any unmitigated adverse environmental impacts and issued a SEQRA Negative Declaration.

125.    As far back as 2001, the Town was aware that the Eagle Ridge Estates Site would be developed into a sizeable residential subdivision.  Upon information and belief, the Town took this fact into account and planned accordingly in connection with its development and revision of its Comprehensive Plan and Zoning Laws.

126.     In or about 2002, development of the proposed Eagle Ridge Estates project was made part of the Rye Hill GEIS, which as described above identified and evaluated potential adverse environmental impacts associated with five other large scale residential developments proposed along the Rye Hill Road Corridor.

127.     The Comprehensive Master Plan adopted by the Town in 2008 identifies Eagle Ridge Estates as one of a number of large-scale residential projects within the Rye Hill Corridor that was then being considered by the Planning Board.

128.     Upon information and belief, the Eagle Ridge Estates Preliminary Approval contained a determination by the Town Planning Board that the project would served the public convenience, safety, and welfare, and was consistent with the requirements of the master plan, the official map, the Town of Monroe Subdivision Regulations and applicable zoning regulations.

129.     Eagle Ridge also obtained numerous other agency approvals for the Eagle Ridge Subdivision project, including preliminary subdivision approval, New York State Department of Environmental Conservation sewer main extension and municipal pump station approvals, Orange County Sewer District No. 1 approval, Orange County Department of Health realty subdivision approval, and Orange County Department of Public Works entrance approval.

130.     After obtaining all of these approvals for the Eagle Ridge project, Eagle Ridge submitted the final subdivision plat to the Town Planning Board for final subdivision approval, but the Town Planning Board has refused to act on it because of the Moratorium.

131.     Since the Preliminary Approval was issued, Eagle Ridge has been unlawfully foreclosed from obtaining final approval for and progressing the subdivision project by the

illegal Moratorium Law, and has a legitimate expectancy that it will be able to build the subdivision.

**E.    Plaintiffs Expended Millions of Dollars to Acquire the Approved Subdivision Projects, to Design and Construct Project and Off-Site Improvements, and to Comply with the Conditions of the Final Approvals.**

132.    The Shea Meadow Final Approval, Polak Farms Final Approval, and Eagle Ridge Estates Preliminary Approval (collectively, the "Approvals") set forth all of the conditions that would entitle Plaintiffs to signing of the subdivision maps by the Planning Board Chair.  Town Law § 276(7)(a).

133.    Once a subdivision map is filed with the county clerk, the lots shown thereon are entitled to certain exemptions from changes to the Town's subdivision regulations, including up-zoning of the Bulk Table.

134.    To be constructed as part of the Projects are various improvements ("Project Improvements"), which consist of a public road, public utilities, stormwater drainage devices, and other elements that are intended to harmonize the Projects with the surrounding areas and minimize and mitigate potential impacts on the environment.

135.    The public road will be constructed parallel to Rye Hill Road through each of the projects, including across the Rye Hill Estates Site.

136.    The Approvals also require Plaintiffs to make certain offers of dedication and/or to deed lands to the Town, to have water and drainage districts formed by the Town Board, to post a letter of credit and/or other form of financial security with the Town, and to enter into a public improvement security agreement ("PISA") relating to the construction of the Project Improvements.

137.    Plaintiffs satisfied these conditions with the exception of entering into a PISA with the Town and posting financial security, which the Town refused to approve under the auspices of the Moratorium.

138.    Plaintiffs seek to compel the Town to enter into a PISA and accept the required financial security with each of the Plaintiffs, so they can continue with the Project Improvements and the filing of the approved final subdivision plats.

139.    But for the refusal of the Town to provide a fitting and proper PISA to each of the Plaintiffs and to approve the dollar amount and form of financial security to be posted by Plaintiffs for the projects, Plaintiffs would have had the final subdivision plats for Shea Meadow, Polak Farms, and Eagle Ridge Estates filed with the Clerk of the County of Orange before the Town adopted the Moratorium Law and the Zoning Law Amendments.

140.    CHAB Five paid over $3.5 million to acquire title to vacant land that cannot be developed, improved and sold in accordance with the Polak Farms Final Approval, or the Rye Hill Estates Negative Declaration.  Without any improvements, neither the Polak Farms Site nor the Rye Hill Estates Site will generate any return for CHAB Five.

141.    CHAB Five's expenditures began with the purchase of the Polak Farm Site on February 18, 2016 for the payment of $3,000,000 to the seller, inclusive of closing costs.  CHAB Five also purchased the Rye Hill Estates Site on February 18, 2016 for the payment of $550,000 to the seller, inclusive of closing costs.

142.    Thereafter, CHAB Five spent additional money on engineering, design and legal fees to further its efforts to secure the signature of the Planning Board Chair on the subdivision plat for Polak Farms, so it could be filed with the Orange County Clerk.

143.    CHAB Five acquired the Polak Farms Site at significant expense in reliance on the fact that the Planning Board had already granted Final Approval, and had adopted a SEQRA Negative Declaration, all of which should have entitled CHAB Five to file the final approved subdivision plat with the County Clerk and commence construction of the Project Improvements for improvement of the Polak Farms Site into the 49-lot subdivision authorized by the Final Approval.

144.    The Town's constant obstruction of the project following the election of the United Monroe candidates to the Town Board has deprived CHAB Five of its constitutional and vested rights.

145.    CHAB Five also spent additional money on engineering, design and legal fees to further its efforts to obtain approval of the subdivision plat for Rye Hill Estates, including the SEQRA negative declaration and the March 8, 2016 public hearing.

146.    CHAB Five acquired the Rye Hill Estates Site at significant expense in reliance on the fact that the Planning Board had already approved the sketch plan and cluster development for Rye Hill Estates and had adopted a SEQRA negative declaration.

147.    The Town's constant obstruction of the project following the election of the United Monroe candidates to the Town Board has deprived CHAB Five of its constitutional and vested rights.

148.    Golden Ray also paid more than $3 million to acquire title to vacant land that cannot be developed, improved and sold in accordance with the Shea Meadow Conditional Final Approval, and without any improvements, the Shea Meadow Site does not generate any return for Golden Ray.

31

149.    Golden Ray's paid $2,760,000 to purchase the Shea Meadow Site on February 18, 2016, plus $50,000 to a third-party for the assignment of the contract of sale between the third-party and the seller.

150.    In addition, Golden Ray spent additional sums of money on engineering work, permit fees, and excavation and clearing of the Shea Meadow Site, so Golden Ray could construct the Project Improvements.

151.    Below is a table listing Golden Ray's expenditures.  This listing was submitted to the Town Board by Golden Ray as part of its Exemption/Variance Application.

| Ex. | **Expense Report** | | |
|---|---|---|---|
| | Paid to: | | Amount |
| 1-A | Meadow Hill LLC | Seller | $2,760,000.00 |
| 2-A | Korinsky & Klein | Contract Vendee | 50,000.00 |
| 3-A | Executive Abstract | Title Company | 17,575.93 |
| 4-B | Barry Terach | Architect | 5,000.00 |
| 5-B | BM Associates | Design | 20,892.50 |
| 6-B | Quick Wit Tech Corp | Design | 800.00 |
| 7-B | Pietrzak & Pfau | Engineer | 14,250.00 |
| 8-C | Allied Excavating | Excavating | 108,800.00 |
| 9-D | Orange County Sewer | Sewer Extension | 10,620.75 |
| 10-E | NorthEast Bank | Loan Expense | 10,590.00 |
| 11 | United Risk Mgmt | Insurance | 11,850.00 |
| | | Total Investment | **$3,010,379.18** |

152.    Golden Ray made these expenditures in reliance on the fact that the Planning Board had already granted preliminary approval and Conditional Final Approval, and had adopted a Negative Declaration, all of which should have entitled Golden Ray to file the final approved subdivision plat with the County Clerk and continue with construction of the Project Improvements.

153.    The Town's constant obstruction of the project following the election of the United Monroe candidates to the Town Board has deprived Golden Ray of its constitutional and vested rights.

154.    Eagle Ridge expended significant funds to acquire title to vacant land that cannot be developed, improved and sold in accordance with the Eagle Ridge Estates Preliminary Approval, and without any improvements, the Eagle Ridge Estates Site does not generate any return for Eagle Ridge.

155.    Eagle Ridge's expenditures include the purchase of the Eagle Ridge Estates Site, and engineering, design, and legal fees to further its efforts to secure the final subdivision approval and the signature of the Planning Board Chair on the subdivision plat, so it could be filed with the Orange County Clerk.

156.    Eagle Ridge acquired the Eagle Ridge Estates Site in reliance on the fact that the Planning Board had already granted the Preliminary Approval, and had adopted a Negative Declaration, all of which should have entitled Eagle Ridge to obtain the final subdivision approval, file the final approved subdivision plat with the County Clerk, and commence construction of the Project Improvements for improvement of the Polak Farms Site into a 42-lot subdivision authorized by the Preliminary Approval.

157.    The Town's constant obstruction of the project following the election of the United Monroe candidates to the Town Board has deprived Eagle Ridge of its constitutional and vested rights.

**F.      The Rise to Power of United Monroe and the November 2015 Town Board Election**

158.    In 2013, residents of Monroe created the citizens' opposition group called United Monroe.  According to its website, United Monroe was created "in response to the unfair and

unbalanced decisions made by the Monroe Town Board" and its goal was "to replace the 3 Town Board members who were up for election in November 2013 since the sitting Board was clearly not representing all of the people of Monroe, but instead, were representing the voting bloc in Kiryas Joel who elected them." United Monroe, About Us, *available at* http://unitedmonroe.org/about-us/ (last accessed July 19, 2017, the about us section of the United Monroe website has subsequently been changed) .

159.     The Village of Kiryas Joel is an adjacent municipality to the Town whose residents predominantly practice the Hasidic Jewish faith.

160.     The true purpose of the formation of United Monroe was to prevent the Hasidic Jewish community from purchasing housing in or moving to the Town, and to prevent the development of housing that would accommodate the needs of the Hasidic Jewish community.

161.     From its inception, United Monroe has vexatiously opposed the projects along the Rye Hill Corridor because it learned that Ziggy Brach—a "Big KJ developer," according to United Monroe (United Monroe Facebook page, Feb. 23, 2016 post, *available at* https://m.facebook.com/story.php?story_fbid=475140862674928&id=135972389925112 (last accessed Mar. 24, 2017))—had an interest in at least one of the projects and the Rye Hill Road projects would make housing available to the Hasidic Jewish community.

162.     United Monroe Chairperson, Emily Convers, who was an alternate member of the Village Planning Board, repeatedly criticized the Village Planning Board for approving the Rye Hill Road projects, claiming that "Monroe citizens do not want more density.  They want to prevent that."  A copy of Ms. Convers' comments are attached as **Exhibit E** and incorporated by reference herein.

163.    In fact, Ms. Convers personally attacked the Rye Hill Corridor developers, who she claimed "represent[] Kiryas Joel leaders and Kiryas Joel interests"—the adjacent municipality inhabited predominantly by the Orthodox Jewish community—and again decried the approval of the Rye Hill Road projects as "quality of life affecting."  Ex. E.

164.    Ms. Convers also asserted that the Village Board members were corrupt for failing "to stop the 507 acre land grab attempt," a reference to a then-pending annexation petition filed by Monroe property owners seeking to annex certain lands from the Town to the Village of Kiryas Joel.

165.    As some of the Rye Hill Corridor projects proceeded with construction of on-site and off-site infrastructure for the benefit of both the Town and the Village, Ms. Convers was again quoted attacking the projects along the Rye Hill Corridor because they would make available high density housing in the Town and the Village of Monroe that could be purchased or occupied by the Hasidic Jewish community.

166.    "The last thing we want in Monroe is more density, and this project has been a nightmare from day one, as far as I'm concerned," Ms. Convers said.  Spectrum News Hudson Valley, *Residents Question Development on Smith Farm in Village of Monroe*, Feb. 25, 2016, *available     at*     http://www.twcnews.com/nys/hudson-valley/news/2016/02/25/monroe-development-.html (last accessed September 25, 2017).

167.    United Monroe and its supporters made clear that the basis for their opposition to the Rye Hill Road projects was anti-Hasidic animus: "This project is written KJPE all over and I predict mass exodus from the Village of Monroe."  United Monroe Facebook page, March 2, 2016                          post,                          *available                          at*

https://m.facebook.com/story.php?story_fbid=477413802447634&id=135972389925112     (last

accessed September 25, 2017).

168.    United Monroe also falsely misrepresented that another project on Rye Hill Road

would consist of 4,000 square foot housing units in order to pressure Defendants to accede to

United Monroe's anti-Hasidic campaign to halt the project and to exclude housing that could be

made available to the Hasidic Jewish community.

169.    Responding to United Monroe's falsehoods, one commenter on United Monroe's

Facebook page stated: "It's written KJ all over. The only place you can see 4000 sq ft

townhouses in this region is Village of KJ.  The development is mix of small and large town

houses that will be similar to the one built in bloomingburg, NY," a nearby village in Sullivan

County where the Hasidic Jewish community has recently moved.  United Monroe Facebook

page,         Feb.         28,         2016         post,         *available*         *at*

https://m.facebook.com/story.php?story_fbid=476397965882551&id=135972389925112     (last

accessed September 25, 2017).

170.    Indeed, Ms. Convers commented:

> our boards have kowtowed to developers for too long. And now we
> need to say "enough". Smith Farm on Gilbert street is a monster of
> a development. 178 homes- some town homes are proposed to be
> up to 4,000 sq ft. The traffic study for this project was performed
> in August, when most are away on vacation. The owner is hiding
> in the shadows and for some reason, even Chris McKenna, the
> great investigative reporter for the Times Herald Record, wasn't
> able to ascertain who owns the property. I can tell you who owns
> it. Ziggy Brach. But why didn't the Village of Monroe tell Chris
> McKenna that? Why is this a secret?
>
> I resigned as an alternate member of the Planning Board in the
> Village of Monroe because I could no longer quietly sit by and
> watch this take place.

United    Monroe    Facebook    page,    Feb.    23,    2016    post,    *available*    *at*
https://m.facebook.com/story.php?story_fbid=475140862674928&id=135972389925112    (last
accessed September 25, 2017).

171.    Responses to Ms. Convers' statements against the Smith Farm project, which is
one of the Rye Hill Corridor projects, included: "So I guess this disgusting monstrosity on
Gilbert Street [the Smith Farm project] will be segregated housing that non hasids will not be
able to purchase?"; "Where are the poorest people getting the money from to buy houses?"; "Just
doing some simple math, one can see at the rate of population growth going on in KJ cannot go
on indefinitely. Assume the average number of children per family is twelve – give or take a few
– and that they all marry at 18 and produce twelve children and so on for a few generations.  In
five generations we are talking half a BILLION people. Think about that – where are they going
to go?  Annexation is not the answer…try some family planning, eh?"  *Id.*

172.    Upon information and belief, United Monroe and Defendants McGinn and
Cardone even sought to force the Town Planning Board chairperson to resign, and then instituted
removal proceedings against her, because she granted approvals for the subdivision projects
along the Rye Hill Corridor, including for Plaintiffs' projects.

173.    The anti-Hasidic Jewish animus in United Monroe's public comments is
unmistakable.  For example, on November 18, 2016, one of United Monroe's founders, John
Allegro, posted on the United Monroe Facebook page:

> Harley Doles [the Town Supervisor] is gearing up to run for office
> again in 2017. He's talking a good game about how he is the only
> person who can protect Monroe from "KJ Lifestyle Housing" and
> the threatened takeover of the Monroe-Woodbury School District.
>
> As usual, anything that comes out of Doles' mouth is filled with
> deflection and distraction. He's going on year two of a propaganda
> campaign in which he is blaming freshman councilmen Tony

Cardone and Mike McGinn for the zoning and planning abuses that
were allowed by Doles appointees.

Do not be mistaken - Doles answers to only one set of masters - the
men who run the KJ government and control hundreds of acres of
real estate that Harley so dearly wants to get annexed into KJ. We
know them as the Kiryas Joel Power Elite, or "KJPE".

In this photo, taken on November 9, 2016, we see Doles and KJPE
member Ari Felberman, conducting a secret meeting at the "Butter
Blend" restaurant in Kiryas Joel.

There is no doubt that these two conniving KJ operatives are
planning their next moves in their quest to fulfill the KJPE goal of
dominance of local government and real estate.

United   Monroe   Facebook   page,   Nov.   18,   2016   post,   *available   at*
https://m.facebook.com/story.php?story_fbid=580575202131493&substory_index=0&id=13597
2389925112 (last accessed September 25, 2017).

174.   What is plainly apparent from Ms. Convers' and Mr. Allegro's comments, as well
as those of United Monroe's supporters, is that United Monroe's opposition to growth in the
Village and the Town is intended to exclude the Orthodox Jewish community by preventing the
housing approved for the Projects, and others, that could be purchased by Orthodox Jewish
families in need of housing in the region.

175.   United Monroe doubled down on its anti-Hasidic Jewish platform for the
November 2015 Town Board election.

176.   Defendants McGinn and Cardone ran for the Town Board on the United Monroe
party line, and overtly supported United Monroe's election slogan to "Take Back Our Town
Board" from the Kiryas Joel Power Elite and Hasidic Jewish community.   United Monroe
Facebook   page,   Nov.   1,   2015   post,   *available   at*

https://m.facebook.com/UnitedMonroeNY/photos/a.148436508678700.1073741828.1359723899

25112/443304572525224/?type=3&source=48 (last accessed September 25, 2017).

177.    During United Monroe's campaign to elect Defendants McGinn and Cardone to the Town Board, it was made very clear that if the United Monroe candidates lost the election, there would be dire consequences.

178.    As the United Monroe supporters explained: "We CANNOT loose this upcoming election. KJ will bus up hundreds from Brooklyn (which I don't understand).  If this election goes against us…..";  "I think the reason why they are moving from Brooklyn is that they cannot exert control over everyone[.]  They already have city buses where they ask women to sit in the back, have signs on the streets in Yiddish asking women to step aside for men to pass through, and other idiocies.  However, since Brooklyn is culturally diverse, they are unable to enforce their position on the populace at large, so they are moving to an area where they plan to be in absolute control."    United Monroe Facebook page, Oct. 12, 2015 post, *available at* https://m.facebook.com/story.php?story_fbid=439088826280132&id=135972389925112    (last accessed September 25, 2017).

179.    Ultimately, United Monroe was successful in electing Defendants McGinn and Cardone to the Town Board in support of its goal of preventing additional Hasidic Jews from relocating to the Town from Kiryas Joel or elsewhere in the region.

180.    Following the election of the United Monroe-backed candidates for the Town Board, one commenter on United Monroe's Facebook page asked: "What concerns me are the communities that are solely marketed to the Hassidic community in Yiddish newspapers and when local real estate people inquire about the property for potential buyers, they are not given specifics.   What concerns me is the size of the planning and zoning boards will allow

mother/daughter homes on property not to become larger than the main house because children of alliance members [a sect of Hasidic Jewish adherents in the Town] must still live by their parents.  What is being done to make sure communities are not segregated communities and that those mother/daughter homes are kept in bay?"  In response, United Monroe promised, "Tony Cardone and Mike McGinn will be addressing the planning and zoning matters."  United Monroe Facebook page, Feb. 11, 2016 post, *available at* https://m.facebook.com/story.php?story_fbid=471547683034246&id=135972389925112 (last accessed September 25, 2017).  And so the push for the Moratorium Law began.

181.    The first step in the campaign to halt the approved Rye Hill Corridor projects, including Plaintiffs', that could make housing available to the Hasidic Jewish community was the firing of the Town Attorney who oversaw the approval of the Projects, and the hiring of a new Town Attorney that was known throughout Orange County as promoting residential building moratoria as a means to address the growth of the Hasidic Jewish community.

182.    Although Plaintiffs applied for all of the necessary, ministerial Town Board approvals to satisfy the conditions of their final subdivision plat approvals well before the Town Board began to consider adoption of a moratorium, the new Town Attorney intentionally delayed any action on Plaintiffs' requests until the Town Board could consider and adopt a moratorium that would prevent construction, sale, and occupancy of the Projects.

183.    The public comments at the public hearing on the Rye Hill Estates project on March 8, 2016 further underscore that anti-Hasidic animus was the driving force behind the opposition to the Rye Hill Corridor projects, including the Polak Farms, Shea Meadows, Eagle Ridge Estates, and Rye Hill Estates projects. A copy of the transcript of the March 8, 2016 public hearing is attached hereto as **Exhibit F**.

40

184.    For example, one commenter asked: "The height of the buildings, are they going to look anything like K.J. where they are hidden apartments and they will turn into three and four-family homes." (Ex. F, at 13:20-23).  That same commenter, then noted, "So, again, the abuse that they were selling it, I believe it was a Yiddish paper selling them as two-family homes before they were even built." (Ex. F, at 14:22-25).

185.    The commenter again compared the proposed Rye Hill Estates project to housing in Kiryas Joel and insinuated that the project would not be built in accordance with approved plans, stating: "The builder is just doing what he wants and we're supposed to close our eyes and make believe we don't know what is going on . . . . but you go over to K.J. over the years that I'm living here, 20 years, they are building literally on the sides of mountains, walls that are going up.  When they have fires, you hear, gee, they didn't have a fire break-in the middle of the building, how could that be?" (Ex. F, at 17:11-18:1).

186.    Another commenter focused on the need to change the accessory apartment law to limit or eliminate the right to build accessory apartments (Ex. F, at 28:45), stating that "five dissatisfied citizens for thousands I think is a fair trade off.  You know, in times when -- and I hate to draw a correlation to the country's national security, or terrorism, or things like that, but, you know, we live in a day and age where I think we all have to make some sacrifices on our own personal liberties or rights for maybe a greater good. And I'd be willing to sacrifice the ability to have an accessory apartment if it protected and ensured the future of our community." (Ex. F, at 29:15-30:3).

**G.**     **After the Approvals Were Issued and in the Midst of Construction of the Project Improvements, Mitigation Measures, and Off-Site Improvements, the Town Board Proposed Adoption of the Moratorium Law.**

187.     In April 2016, after the Town Planning Board had granted the approvals for the Polak Farms, Shea Meadow, and Eagle Ridge Estates projects and while Plaintiffs sought to begin the Project Improvements, Mitigation Measures, and Off-Site Improvements required by their approvals, the Town Board proposed adoption of a local law that would impose a moratorium on issuance of all approvals for residential development, including projects that had been previously approved and were under construction, like Plaintiffs' projects (the "Proposed Moratorium Law"), a true and correct copy of which is appended hereto as **Exhibit G** and incorporated herein by reference.

188.     As set forth in Section 1 of the Proposed Moratorium Law, its purpose was to prevent further development of residential construction while the Town Board would undertake a review of the Town's Comprehensive Master Plan ("CMP") and its land use laws. No specific amendments to the Town's CMP or zoning, however, were proposed or referenced in the Proposed Moratorium Law.

189.     Section 2 of the Proposed Moratorium Law prohibited issuance of every conceivable approval for residential development, including mere ministerial approvals for previously approved projects, as well as for those under construction:

> Section 2. Scope of moratorium.
>
> A. Moratorium on the issuance of residential building permits and other actions: *No building permit application shall be accepted, and no pending building permit application shall be further processed or approved . . .*
>
> B. Moratorium on actions by the Town Board, Planning Board and Zoning Board of Appeals: The Town Board, Planning Board and Zoning Board of Appeals *shall not process*, hear, rehear, approve

or *sign any new or pending preliminary or final site plan*, preliminary or final subdivision, special permit, variance or other land use application or permit which related directly or indirectly to residential construction, *including but not limited to any grading permit, erosion and sediment control permit, wetland permit, sewer connection permit, floodplain development permit, water connection permit, which may be granted in association with residential construction*.

Ex. G, Proposed Moratorium Law § 2 (emphasis added).

190.    The Proposed Moratorium Law proposed an initial three-month term, with the further provision that the Town Board could "by Local Law, extend the period of this moratorium for an additional three (3) months or such other and further time period that is reasonable and scope and duration." Ex. G, Proposed Moratorium Law § 5.

191.    The Proposed Moratorium Law delegated to the Town Board authority to grant relief from the Moratorium "in its absolute discretion" upon a showing of "severe hardship," which the Proposed Moratorium Law defined as "no economic return on any land purchase." Ex. G, Proposed Moratorium Law § 3.

192.    The Proposed Moratorium Law was referred to Orange County Planning Department ("OCPD") for review under GML §§ 239-l and 239-m.

193.    In response, OCPD issued a review letter (the "Moratorium 239 Review Letter") explicitly cautioning the Town Board about many of the provisions that have given rise to this litigation. A true and correct copy of the Moratorium 239 Review Letter is appended hereto as **Exhibit H** and incorporated by reference herein.

194.    OCPD advised that the proposed three-month moratorium while the Town reviewed and updated its Comprehensive Plan would be insufficient because Comprehensive Plan updates typically require significantly longer than three months:

> We advise the Town that Comprehensive Plan updates undertaken recently by other municipalities throughout the County and region have required, *on average, more than a year to complete*. . . . We advise the Town, therefore, to determine *whether three months is sufficient to review and analyze the existing Comprehensive Plan and propose meaningful updates*.

Ex. H, Moratorium 239 Review Letter at 1 (emphasis added).

195.    OCPD focused in detail on the effect that the Proposed Moratorium Law would have on residential developments — like Plaintiffs' projects — that had been granted final approvals, as well as the requirement for "severe" hardship to obtain an exemption from the Moratorium. OCPD expressed very strong reservations and cautioned the Town Board that application of the Moratorium to an approved project could cause significant hardship. OCPD encouraged the Town Board to consider exempting projects with final approvals from the Moratorium:

> [T]here is expected to be a set of projects with varying levels of existing approvals, *including potentially final approval from the planning board*, that will be affected by the moratorium as written. *These projects should be inventoried prior to any moratorium taking effect*, as the proposed requirement for relief from the moratorium to evidence "severe" hardship, equaling a showing of "no economic return on any land purchase." The use of the term "severe" is unusual in this context. As such *moratoria on projects given conditional final or final approval can impose a significant hardship*. While it can be permissible to enact the same, it is the Department's recommendation that the Board take a true "hard look" at moratoria on projects with that level of approval status. *The Department is not making any binding comment on the same but encourages the Board to consider whether it is appropriate to exempt all (or even portions) of those projects from the moratorium*.

Ex. H, Moratorium 239 Review Letter at 1-2 (emphasis added).

196.    Like the OCPD, the Town Planning Board attorney also advised the Planning Board that the proposed moratorium was illegal and could not withstand scrutiny.

197.    The Town Board held public hearings on the Proposed Moratorium Law in April 2016.

198.    Plaintiffs, through counsel, appeared at the hearing and spoke in opposition to the Proposed Moratorium Law and its application to Plaintiffs and the Projects.

199.    Written comments on the Proposed Moratorium Law were also submitted on behalf of Plaintiffs and multiple other property owners with residential projects in various stages of development approval (the "Property Owners Moratorium Comment Letters").   Plaintiffs' written comments reiterated that applying the Proposed Moratorium Law to properties and projects where property rights had vested and for the purpose of excluding housing that would serve the needs of the Hasidic Jewish community, was not only unreasonable, but illegal and a violation of Plaintiffs' constitutional rights. True and correct copies of the Property Owners Moratorium Comment Letters are appended as **Exhibit I** and incorporated herein by reference.

200.    Multiple comment letters and oral comments in support of the Proposed Moratorium Law were also submitted by people characterizing themselves as residents of the Town for many years (the "Residents Moratorium Comment Letters"). True and correct copies of the Residents Moratorium Comment Letters are appended as **Exhibit J** and incorporated by reference herein.

201.    The Residents Moratorium Comment Letters demand the enactment of the Proposed Moratorium Law to defeat and obstruct residential growth and development in the Town, particularly any growth and development perceived to be by or on behalf of the Hasidic Jewish community in nearby Kiryas Joel. *See* Letter from Claus H. Luhrssen, Ex. J, Residents Moratorium Comment Letters at 1 (calling for the enactment of the Proposed Moratorium Law to thwart the so-called "Kiryas Joel Power Elite"); *see also* Ex. J, Residents Moratorium Comment

Letters (multiple emails sent by various individuals demanding the Moratorium so the Town Board can "save OUR QUALITY OF LIFE!!!"; arguing that large scale builders area getting paid millions to put in developments and care nothing about the local residents' homes and life style, and that high density housing is not conducive to the residents' rural lifestyle; and cautioning that the Town Board should be held accountable to the local residents).

202.    The public comments on the Town's proposed Moratorium Law also repeatedly decried the "concrete 'low income' multifamily housing developments . . . and townhouses" that the public believed are "not conducive to our way of life."  (Ex. J (Email from Mike Endrizzi to Alexandria Trovato, dated April 21, 2016), at 1).

203.    Urging the Town Board to oppose the proposed developments in order to "save 'OUR' town," the comments advocated for adoption of the moratorium and requiring the developers, such as Plaintiffs, to "get current permits & update their development plans for current/zoning and code requirements."  (*Id.* at 1-2).

204.    The Proposed Moratorium Law was the product of very strong political pressure by local residents, especially mobilized by the United Monroe organization, which has a long track record of opposing development of housing for the Hasidic Jewish community.

205.    Two of the candidates strongly supported by United Monroe, Town Boardmembers McGinn and Cardone, were elected to the Town Board and were staunch proponents of the Moratorium.

206.    The Town Board has adopted the community's desire to keep Hasidic Jews out of the Town.

207.    At the November 16, 2015 Town Board Meeting, Boardmember McQuade observed, "[w]hen I was over in KJ when we voted over the annexation ... my decision to allow

the annexation, my decision let's let KJ stay over in KJ, out of our schools, and prevents East Ramapo."

208.    The Town Board has repeatedly recognized that the pending developments at issue are lawful and "above board," yet in response, members of the community shouted, "[t]here are vans of Hasids looking at those houses . . . I don't want Hasids in my back yard! They're right there, the vans of Hasids. . . . all they have to do is buy a temple . . . they're taking over."  The commenters continued, asking, "So the Hasids aren't going to move in there?" and "Who are the Hasids there? Why are they there?" The crowd continued, "I just don't want Hasids in my backyard!"

209.    Town Supervisor Harley Doles has also made numerous statements confirming the Town's intent of preventing the encroachment of developments that would attract Hasidic Jews to Monroe.

210.    For instance, Supervisor Doles remarked, "Originally it was thought that it might be an idea for tourism, but when we heard that it was being reinterpreted as some kind of agreement to be able to have the Hasids proliferate in these hotels . . . ."

211.    Supervisor Doles also stated: "To take some of the builders and their absolutely inventive ways of taking single family RR1 Properties and turning them into . . . futuristic housing of Kiryas Joel. And what you see behind us is a good example; it's been up there all night long. These KJ lifestyle developments . . . This is what some people are planning as the future of housing in the Town of Monroe. And it's not going to be just in the 507.  It's going to be outside of the 507 . . . whenever some developer decides, complements of whoever it is out there . . . to suck up to whoever they have to suck up to . . . that's going to be the reality.  So

what you're looking at folks, that's your new Monroe. Whether you like it or not, if we don't change the laws now, it's there now and there are going to be more of them."

212.     Supervisor Doles also stated: "Someone is saying that they're being manipulated right now, that [pointing at photo of Hasidic home] is manipulation!"  "What about a one-family house that is somehow turned into a twelve family disaster."

213.     The Town Board plainly shares the community's desire to keep Hasidic Jews out of their backyard. The remarks concerning "KJ lifestyle developments" and prejudicial assumptions concerning large-family units do not relate to anything other than a bias against housing that could be made available to the Hasidic Jewish community.  The Town's goal of preventing Hasidic families from "proliferating" in Monroe could not be clearer.

214.     This theme continued at the March 21, 2016 Town Board Meeting.  There, Supervisor Doles stated, "Kiryas Joel has had 30 or 40 years to—I use the term plot their growth. I don't say it in a deceptive way, to plot their growth, and you think 90 days is going to make any difference? Does anyone think that 90 days is going to make any difference?"  The Supervisor pointed to Ramapo as a warning and remarked that "one KJ is enough."

215.     Other community members similarly expressed disdain for the Hasidic community: "The reason behind the rhetoric is to get everyone really scared . . . into thinking that not having the annexation is going to be worse . . . . That's like institutionalized blockbusting and it's a terrible threat to make that you're just going to come in and take over . . . . They're [the new board] not doing what you did, which is ignore code for years and then suddenly fabricate an emergency for your own political reasons, which is to work for your masters who are the KJ leadership."

**H.     Disregarding OCPD's and Plaintiffs' Comments, and Bowing to Intense Political Pressure, the Town Board Adopted the Proposed Moratorium Law.**

216.     There is no evidence in the record of proceedings before the Town Board concerning the Proposed Moratorium Law that it ever undertook any of the analyses or took the "hard look" at the effect the Proposed Moratorium Law would have on previously approved projects, that the OCPD recommended.

217.     Instead, on April 25, 2016, the Town Board adopted the Moratorium Law.  A true and correct copy of the Moratorium Law is appended hereto as **Exhibit K** and incorporated by reference herein.

218.     The Moratorium Law was identical to the Proposed Moratorium Law insofar as is relevant to this litigation. In adopting the Moratorium Law, no Town Board member proposed any amendments to the Proposed Moratorium Law in response to Plaintiffs' comments or the OCPD's Moratorium 239 Review Letter. Instead, the Town Board simply acceded to the strident voices in the community demanding a halt to any significant residential development in the Town.

219.     Indicative of the stridency of community opposition, at the beginning of every Town Board meeting, at the end of the Pledge of Allegiance, the members from United Monroe in attendance yell out the last two words of the Pledge, as follows: "with liberty and justice FOR ALL!" The clear message is that unless United Monroe obtains what it wants—in this case the Moratorium—then the Town Board will be denying its local citizens and residents justice. This is just one form of overt political pressure that was exerted on the Town Board to force the adoption of the Moratorium Law.

220.     The term of the Moratorium Law was kept at three months even though Plaintiffs, other developers, and OCPD informed the Town Board that such a period of time was impossible

for study of the CMP and the Town's land use laws, as well as formulation, consideration and adoption of any proposed changes to either or both.

221.    The Town Board knew that fact as well but chose to keep the period for the Moratorium at three months so that "severe hardship" would be artificially measured against three-month blocks of time and would be far more difficult to demonstrate than if the Town Board was forthright and acknowledged the true required duration of its planning and zoning review.

222.    Indeed, as expected, the Moratorium Law was extended *six* times.

223.    The Moratorium Law had an immediate effect on the Projects. It prohibited the Town Planning Board from granting Eagle Ridge the final subdivision approval to which it is entitled, and the Chairperson from signing the approved final plats for Polak Farms and Shea Meadow.  It prohibited the Town Planning Board from considering and granting preliminary and final subdivision approval for Rye Hill Estates. It prohibited the Town Board from approving the PISAs and the Letters of Credit. It prohibits the Town from issuing any land disturbance or clearing permits for construction of Project Improvements, Mitigation Measures, and Off-Site Improvements in the Town.

224.    The Moratorium Law also held in abeyance any default approvals that might otherwise occur given inaction due to the moratorium. Section 2.0 of the Moratorium Law provides: "To the extent that any provision of New York State Town Law imposes a time frame for action by a municipal entity, board or body so that a default approval will result from any inaction, the time for any action required by any Town Board, Body, Agency or other entity shall be and is hereby extended until this moratorium and any as well as all extensions thereof have expired and have not been extended by the Town Board."

50

225.     Thus, the Moratorium Law, during its pendency, prohibited development of the Projects, and brought all significant new residential development in the Town to a halt.

226.     The Moratorium Law also provided no assurance or guarantee to Plaintiffs that the layout and configuration of their Projects would not be rendered obsolete or economically unviable by reason of the Town adopting zoning laws that impose different lot width, front yard setback, and other bulk table restrictions. If the bulk table requirements were changed ("up-zoned") (which, it turns out, they were), then the layout of the Projects would also change and, thereby, result in Plaintiffs incurring additional expenses to re-engineer the Project and likely have its total lot count reduced to conform to new zoning laws.[2]

227.     In fact, as discussed *infra*, the Town has now adopted revisions to its current Zoning Law that will severely limit the allowable density of the Project Sites that will effectively cut the Projects in half.

I.     **The Moratorium was not in Response to an Emergency and was not Stop-Gap Zoning.**

228.     The Moratorium Law contained no findings that the Town faced any actual crisis or emergency or that the Moratorium Law was enacted in response to any crisis or emergency condition.

229.     Section 1.0 of the Moratorium Law stated that the "Town Board finds that factors in connection with development or potential development in the Town as well as the potential development of a land within the surrounding areas *may* have a significant impact on the health, safety and general welfare of the Town . . .". (Emphasis added.) Ex. K, Moratorium Law at 2.

---

[2] The Town cannot avoid liability for violating the rights of a developer by repeatedly changing its zoning laws to send the developer back to the drawing board to redesign its plans to conform to new zoning regulations. *See Sherman v Town of Chester*, 752 F.3d 554 (2d Cir. 2014).

230.    The Town Board was unable to document any *definite* significant impact on health, safety and welfare from development or potential development, no less an actual emergency.

231.    The Moratorium Law ignored the Planning Board's express findings to the contrary about the suitability of the Projects and their consistency with the Town's health, safety and welfare.

232.    Nor did the Moratorium Law state that it was adopted to preserve the status quo while specific proposed amendments to the Town's CMP or zoning laws were considered by the Town Board.

233.    At the time that the Moratorium Law was adopted, there were no proposed local laws pending to amend the Town's CMP or zoning laws.  Thus, the Moratorium Law was not interim or "stop-gap" zoning.

234.    Section 1.F of the Moratorium Law stated that "[t]he Town Board hereby finds that the adoption of a moratorium on the development of residential construction will best maintain the status quo during the study period in order to prevent interim development from frustrating the objectives of the study."

235.    As to the Projects, the only way such "frustration" could occur would be if the CMP and zoning law amendments precluded that which currently allowed by the Final Approval Resolutions and the other permits and approvals for the Projects obtained by Plaintiffs. And that is exactly what the Zoning Law Amendments did.

236.    With respect to Plaintiffs' projects, the intent of the Moratorium Law was obvious: prevent Plaintiffs from further developing the Projects and further vesting their rights so

that the applicable zoning could be changed and Plaintiffs' vested property rights prejudiced. As applied to Plaintiffs, no other purpose for the Moratorium Law was possible.

**J.      The Town Board Extended the Moratorium Law Without Giving Notice of a Public Hearing or Referral to Orange County Planning.**

237.     As predicted by OCPD, the Town was unable to complete the CMP review and zoning law update process within the initial three-month moratorium period. Indeed, the Town had not even completed the first step in the process within the initial three-month moratorium period — obtaining a report identifying the baseline conditions in the Town.

238.     At the July 18, 2016 Town Board meeting, the Town Board considered whether to extend the Moratorium. On information and belief, no proposed local law extending the Moratorium Law had been posted, no notice of public hearing had given, and no referral of the proposed First Moratorium Extension Law had been made to OCPD, per New York General Municipal Law §§ 239-l and m.

239.     On July 25, 2016, the Town Clerk of the Town of Monroe filed with the New York State Department of State ("NYSDOS") a copy of the First Moratorium Extension Law, denominated as Local Law No. 2 of 2016 and entitled "Implementing an Extension of the Moratorium on the Development of Residential Property of the Unincorporated Town of Monroe, New York." A true and correct copy of First Moratorium Extension Law and the NYSDOS submittal forms are appended as **Exhibit L** and incorporated herein by reference.

240.     The Town then adopted a "Second Moratorium Extension Law" on October 26, 2016.  See **Exhibit M**.

241.     Again, upon information and belief, with respect to the Second Moratorium Extension Law, no proposed local law extending the Moratorium had been posted, no notice of

public hearing was given, and no referral of the proposed Second Moratorium Extension Law had been made to OCPD, per New York General Municipal Law §§ 239-l and m.

242.    In addition, as of the time the Second Moratorium Extension Law was adopted on October 26, 2016, the consulting firm engaged by the Town had not yet even "completed the required review and study" necessary to propose revisions to the Town's CMP. *See* Exhibit M, at Section 1, F ("the Town Board hereby finds that the required review and study by the Firm will not be completed within three (3) months from the effective date of Local Law No. 2.").

243.    In all the Town adopted *six* extensions of the Moratorium, the latest extension of the Moratorium was adopted on or about July 31, 2017.  Copies of the third, fourth, fifth, and sixth Moratorium Extension Laws are attached as **Exhibits N, O, P, and Q** respectively.

244.    Throughout this time, the Town Board continued to adopt piecemeal three-month extensions to the Moratorium, even though the Town Board knew (from both the advice of its former legal counsel and the OCPD) that it would be impossible within that period of time to study, propose, and adopt revisions to the CMP and/or the Town's land use laws.

245.    These piecemeal extensions to the Moratorium were intended by the Town Board to hinder and frustrate Plaintiffs and similarly situated developers from establishing their entitlement to a hardship exemption/variance from the Moratorium because, in part, it is seemingly unreasonable to find that a hardship will result from an isolated three-month long moratorium. However, when multiple extensions of the Moratorium were required because the actual review and legislative process to revise a comprehensive plan and zoning laws took more than 18 months, the case for a hardship variance was readily apparent.

**K.    Plaintiffs File Exemption/Variance Applications Supported by Hard Dollars and Cents Proof of Vested Rights and Severe Hardship.**

246.    Section 3 of the Moratorium Law authorized the Town Board to grant an exemption/variance from the Moratorium if: (1) the Moratorium imposed severe hardship; (2) granting the exemption/variance was consistent with the health, safety, and general welfare of the inhabitants of the Town and their property; and (3) granting the exemption/variance was in harmony with the spirit and purposes of the Moratorium Law.

247.    On May 12, 2016, Golden Ray filed its Exemption/Variance Application for the Shea Meadow project, a copy of which is attached as **Exhibit R**.  In the Exemption/Variance Application, Golden Ray detailed the multiple discretionary and ministerial approvals it had received for Shea Meadow, as well as the millions of dollars expended in reliance thereon.

248.    The Exemption/Variance Application advised the Town Board that the Town Planning Board, as recently as 2014, had made detailed findings that Shea Meadow would not harm the public's health, safety, and general welfare; would substantially serve the public convenience, safety, and welfare; and would not be detrimental to the surrounding neighborhood or its residents.

249.    While the Moratorium conditioned granting an exception/variance application on a finding that doing so was in harmony with the Moratorium, the Moratorium set forth no proposed zoning amendments against which to make such an assessment.

250.    The only relevant finding in this regard is that of the Planning Board in the Final Approval for Shea Meadow, determining that the project promotes flexibility of design and development of land, constitutes the most appropriate use of land and facilities, preserves the natural and scenic qualities of open land, and is appropriate and consistent with the requirements

of the master plan, the official map, the Town subdivision regulations, and applicable zoning regulations.

251.    On June 27, 2016, CHAB Five filed its Exemption/Variance Application for the Polak Farms Project, a copy of which is attached as **Exhibit S**.  In the Exemption/Variance Application, CHAB Five detailed the multiple discretionary and ministerial approvals it had received for the Polak Farms project, as well as the millions of dollars expended in reliance thereon.

252.    The Exemption/Variance Application advised the Town Board that the its Planning Board, as recently as 2014, made detailed findings that Polak Farms would not harm the public's health, safety, and general welfare; would substantially serve the public convenience, safety, and welfare; and would not be detrimental to the surrounding neighborhood or its residents. In short, it demonstrated satisfaction of the second element of the Moratorium's hardship standard.

253.    The only finding relevant to whether granting an exception/variance application is in harmony with the Moratorium is that of the Planning Board that Polak Farms promotes flexibility of design and development of land, constitutes the most appropriate use of land and facilities, preserves the natural and scenic qualities of open land, and is appropriate and consistent with the requirements of the master plan, the official map, the Town subdivision regulations, and applicable zoning regulations.

254.    Because the Town Board denied Plaintiffs' Exemption/Variance Applications, after the Moratorium illegally precluded any progress on Plaintiffs' projects prior to the enactment of the Zoning Law Amendments, Plaintiffs had no choice but to commence this litigation in order to vindicate their rights and seek appropriate relief from this Court.

L.     **A Similarly Situated Developer Informs the Town Board That the Town Attorney Represented to a Federal Judge that an Identical Moratorium Law He Drafted Would Not Apply to a Project With Vested Rights.**

255.    The Town of Monroe Attorney, Dennis Lynch, is also counsel to the neighboring Village of South Blooming Grove ("SBG").

256.    Upon information and belief, Mr. Lynch drafted the Moratorium Law and also drafted a virtually identical proposed moratorium law for SBG. The proposed SBG moratorium law is, in all material respects, a verbatim repetition of the Moratorium Law at issue in this case.

257.    The proposed SBG moratorium law was the subject of proceedings before the United States Bankruptcy Court for the Eastern District of New York during which Mr. Lynch appeared on behalf of SBG and Mr. Steven Barshov (counsel for BMG Monroe I, LLC, a similarly situated developer of a project within the Rye Hill Corridor) appeared on behalf of the debtor, Keen Equities, LLC. Keen sought a temporary restraining order and preliminary injunction preventing SBG from holding a public hearing on the proposed adoption of the SBG moratorium law.

258.    In the course of oral argument before the Bankruptcy Judge, Mr. Lynch stated on the record that a property owner with vested rights would be exempt from the proposed SBG moratorium law.

259.    Mr. Lynch repeated this statement and legal conclusion publicly as was reported in an September 9, 2016 Times Herald-Record article by Richard J. Bayne, a copy of which is available at http://www.recordonline.com/news/20160909/south-blooming-grove-redrafting-proposed-residential-construction-moratorium (last accessed September 25, 2017).

260.    On August 26, 2016, Mr. Barshov on behalf of BMG Monroe wrote to the Town Board (copying the Town Attorney, Mr. Lynch) to inform it of Mr. Lynch's representation to the

Federal Bankruptcy Court Judge that projects with vested rights would be exempt from an identical moratorium law to the Moratorium Law in effect in the Town (the "8/26/16 Barshov Letter"). A copy of 8/26/16 Barshov Letter is appended hereto as **Exhibit T** and is incorporated herein by reference.

261.    The 8/26/16 Barshov Letter informed the Town Board that a denial of the other developer's Exemption/Variance Application would not merely be unlawful, but would be a knowing and intentional violation and deprivation of the developer's constitutionally protected vested property rights, since Mr. Lynch's representation that projects with vested rights would be exempt from the proposed SBG moratorium law applied with equal force and effect to the identically worded Moratorium Law.

**M.    No Evidence was Submitted in Opposition to Golden Ray's and CHAB Five's Exemption/Variance Applications, Which the Town Board Denied Without Discussion, Findings, or Legal Conclusions.**

262.    The Town Board conducted its hearing on Plaintiffs' Exemption/Variance Applications on June 16, 2016, July 11, 2016, and  July 25, 2016.

263.    While many local residents voiced their lay opinion in opposition to the project, no qualified experts testified during the hearing in opposition to Plaintiffs' Exemption/Variance Applications.

264.    The public hearing was held open for 10 days for submission of written comments.

265.    Upon information and belief, the Town Board retained no consultants to evaluate the Exemption/Variance Applications and received no reports or evidence from any qualified experts (other than that submitted by Plaintiffs) in relation to the Exemption/Variance Applications.

266.   The comments made by the persons who spoke during the hearings in opposition to granting Plaintiffs' Exemption/Variance Applications merely reiterated concerns about traffic, congestion, water consumption, sewer discharge, and other miscellaneous comments, all of which were matters that were addressed by the Planning Board in connection with the Planning Board's detailed and lengthy review of the Subdivision Applications of the Projects.

267.   During the Town Board hearing on another development project on July 18, 2016, United Monroe commented on its Facebook page: "Moratorium hearings going on right now at the senior center. Here's a clip of Councilman Gerard McQuade commending [BMG Monroe's] lawyer Ronald Kossar.  McQuade is incapable of containing himself as he supports one of his masters."   United   Monroe   Facebook   page,   July   18,   2016   post,   *available   at* https://www.facebook.com/UnitedMonroeNY/videos/528130610709286/   (last   accessed September 25, 2017).

268.   As the comments to the post make clear, the United Monroe opposition to the projects along the Rye Hill Corridor, including Plaintiffs' subdivisions, is based upon discriminatory animus against the Hasidic Jewish community: "And the work of the KJPE plan continues to be carried out by one of their puppets!!"

269.   At the September 14, 2016 Town Board meeting, Town Boardmember Colon was not in attendance. The Town Board went into executive session to discuss the threat of litigation at the beginning of its meeting.

270.   Following the executive session, a motion was made to deny Plaintiffs' and other developers' Exemption/Variance Applications and it received a second. There was no discussion of the motion or of the Exemption/Variance Applications.

271.    A vote was taken on the motion, and Town Board members Cardone, McGinn, and McQuade and Town Supervisor Doles voted to deny the Exemption/Variance Applications. A copy of the Town Board's determinations is attached as **Exhibit U**.

272.    The Town Board made no findings of fact and articulated no conclusions of law regarding the Exemption/Variance Applications.

273.    The Town Board did not state any rationale to support its denial of Plaintiffs' Exemption/Variance Applications, and it did not make any record of what standard it was applying with respect to its denial Plaintiffs' Exemption/Variance Applications. *See* Exhibit T.

274.    The Town Board did not communicate to Plaintiffs that their Exemption/Variance Applications had been denied.

275.    Following the arbitrary and discriminatory denials of all of the Exemption/Variance Applications before the Town Board for the projects in the Rye Hill Corridor, Eagle Ridge and CHAB Five determined that applications for an exemption or variance from the Moratorium for the Eagle Ridge Estates and Rye Hill Estates subdivisions would be futile.

**N.    The Moratorium Law and Denial of the Exemption/Variance Applications, as well as Delay by the Town Attorney, Have Prevented Issuance of Land Disturbance and/or Clearing Permits, Approval of the PISAs and Letters of Credit, and Signing of the Approved Final Plats.**

276.    Plaintiffs require land disturbance and/or clearing permits to construct and install Project improvements, Mitigation Measures, and Off-Site Improvements in the Town. Prerequisites for issuance of such permits include approval of the PISAs and Letters of Credit. A prerequisite to receiving a building permit is the signing of the Approved Final Plats by the Town Planning Board Chairperson.

277.    Under the Town Code, the Town Attorney is to draft the PISAs at Plaintiffs' expense.

278.    What ensued, however, was a protracted period in which it became increasingly clear that it would be impossible to obtain the promised review of the PISAs and the final language from the Town Attorney or his colleagues at his firm.

279.    The delays by Mr. Lynch occurred prior to the Moratorium Law's adoption on April 25, 2016.

280.    Plaintiffs were ready, willing, and able to post Financial Security with the Town so their final subdivision plats for Polak Farms and Shea Meadow could be signed by the Planning Board Chair and filed with the County Clerk.

281.    Finalization and approval of the PISAs and posting of financial security were the only two open conditions of the Shea Meadow and Polak Farms Final Approvals.  These two conditions, along with the denial of the Exemption/Variance Applications, have precluded the signing of the Approved Final Plats by the Planning Board Chair and substantially prejudiced Plaintiffs' rights.

**O.    Amendment of the Accessory Apartment Law Furthered the Town's Campaign to Make Housing Unavailable to the Hasidic Jewish Community.**

282.    Although the Moratorium Law was purportedly adopted so the Town could study and update its comprehensive master plan, and the conclusion of that purported effort was nowhere in sight, the Town Board nevertheless also adopted a major revision to the Monroe Zoning Code to limit the size of accessory apartments before undertaking any revisions to its master planning document.

283.    The Town's attempt to invoke the need to revisit its comprehensive plan as grounds for adoption of the Moratorium Law rings hollow, because the Town continued to adopt

zoning amendments designed to exclude residential uses before it has even undertaken any revisions to its comprehensive plan.

284.    Particularly, the Town Board adopted Local Law No. 2 of 2017 to "meet the special housing needs of senior citizens, single persons and small households; to ensure the retention of single-family neighborhood character," among other things, by allowing "any owner occupying a single-family dwelling" to apply to the Planning Board to add an accessory apartment to his or her home, so long as the apartment is no more than 750 square feet or 30% of the square footage of the original home, whichever is less (the "Accessory Apartment Law").  A copy of Town of Monroe Local Law No. 2 of 2017 is attached as **Exhibit V**.

285.    Besides the size limitation, which is designed to make accessory apartments unavailable to the Hasidic Jewish community—as a result of their religious and cultural practices, Hasidic Jews generally have larger families and require more housing space—the limitation of the right to apply for an accessory apartment to an "owner occupying" a home for at least 10 years arbitrarily restricts corporate entities that own property in the Town, such as Plaintiffs, landlords who rent their homes, and others, from qualifying for the same rights.  No legitimate zoning or planning justification is given for these exclusions.

286.    Furthermore, the Accessory Apartment Law grants the Town Board arbitrary and unlimited authority to waive the 10-year wait period, but only for accessory apartments that would be occupied by seniors or disabled persons, and no others.  The Accessory Apartment Law also fails to articulate any standards for granting such a waiver.

287.    The true purpose of the Accessory Apartment Law is to make housing unavailable to the Hasidic Jewish community.

288.    Indeed, United Monroe long pushed for limiting the size of the accessory apartments permitted under the Town's Zoning Code or eliminating the accessory apartment provision altogether.

289.    Once Defendants Cardone and McGinn were elected to the Town Board, United Monroe promised that the newly elected Town Board members would address the accessory apartment problem, and the Town Board followed through on United Monroe's promise less than two months after Defendants Cardone and McGinn took their seats.

290.    Defendants' discriminatory campaign against Plaintiffs and the Hasidic Jewish community continues to date, with the Zoning Law Amendments also making housing unavailable in the Town.

**P.    The Town Adopted Zoning Amendments More than 18 Months After Enacting the Moratorium Law to Deprive Plaintiffs of Their Vested Rights**

291.    On November 20, 2017, the Town adopted the Zoning Law Amendments by Local Law No. 6 of 2017.  A copy of the draft Zoning Code showing the proposed Amendments is attached as **Exhibit W;** a copy of Local Law No. 6 of 2017 is attached as **Exhibit X**.

292.    These changes significantly limit the allowable density on the Project Sites and deprive Plaintiffs of their vested rights.

293.    The proposed Zoning Law Amendments impose a "Ridgeline Protection Overlay District" ("RPO") over a "Water Supply Protection Overlay District ("WSPO") over Plaintiffs' Projects, which severely limits the allowable density of the approved projects and results in an unconstitutional regulatory taking of Plaintiffs' property.

294.    The Zoning Law Amendments impose a number of restrictions on Plaintiffs' Projects, including, but not limited to:

a. Requiring the submission of new information to the Planning Board regarding the construction of the Projects, including:

    i. Architectural rendering of proposed structures, indicating the size ad shape, siding color and material, window locations, size and type and roofing color;

    ii. Information and samples related to materials and colors proposed for the construction;

    iii. Information related to potential visual impacts;

    iv. Soil stability analysis; and

    v. Tree surveys.

b. The Planning Board may require all construction on the Project Sites to occur outside the RPO district, effectively depriving Plaintiffs of significant amounts of property on which they had previously intended to construct residential homes pursuant to the Approvals;

c. Severe restrictions on construction including limiting the types of building material that can be used and limiting the removal of vegetation up to, and including, regulating the type of lighting that can be used in these residences;

d. Limiting lot coverage of any property to 15 percent, or 35 percent where a proposed development integrates stormwater quality controls.

295. Upon information and belief, subjecting Plaintiffs' property to the Town's zoning restrictions for the RPO and WSPO districts will effectively cut Plaintiffs' projects in half, in violation of their vested rights.

296.    Upon information and belief, the purpose of the zoning amendments is to exclude housing that would be available to the Hasidic Jewish community.

297.    Further, the Zoning Law Amendments will require Plaintiffs to return to the Planning Board for new approvals.

298.    To receive a new subdivision approval Plaintiffs will be required by the Zoning Law Amendments to prepare three separate subdivision plans, a "conservation plan, a conventional subdivision plan, and a conceptual cluster plan."   The preliminary plans are required to be designed with a very high level of detail, which is time consuming and expensive.

299.    The Zoning Law Amendments require the preliminary plans to be designed in accordance with not only all applicable Town regulations, but also all other applicable local, state, and federal laws, regulations, and standards.   The maps must show all environmental constraints as defined in Town Code § 57-21.1, and have roads designed with profiles and grading, stormwater basins, wells, septic systems, etc.   this is an exceptionally high level of refinement for a single preliminary plan, and the Town now requires three separate and highly detailed plans just for its preliminary review.

300.    In accordance with Zoning Law § 57-21.1(b)(1):

"The Planning Board shall review the conservation, cluster and conventional plans and shall require such other and further details for each plan that it reasonably believes necessary to evaluate same."

301.    This gives the Planning Board seemingly unbridled discretion on the level of detail the plan will require, possibly up to joint soils testing, sewage disposal design, well testing, SWPPP preparation, etc., before a decision is made on what type of subdivision the Applicant will be permitted to pursue.

302.    After having already incurred the considerable expense of obtaining subdivision approvals, the Zoning Law Amendments will require Plaintiffs to start over again from scratch, in violation of Plaintiff's constitutional rights.

### AS AND FOR A FIRST CAUSE OF ACTION

**U.S. Constitution, Fourteenth Amendment**
**42 U.S.C. § 1983**

303.    Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

304.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides, in pertinent part, that no state shall "deprive any person of life, liberty or property, without due process of law."

305.    Defendants' laws and policies gave Defendants unfettered discretion to grant or deny building permit application for the Projects.

306.    Defendants arbitrarily enacted the Moratorium Law and continue to arbitrarily apply existing ordinances against Plaintiffs.  Defendants' actions are designed to prevent completion of the Project to prevent the Hasidic Jewish community from relocating to or residing in the Town and freely practicing their religion.

307.    The Town lacked authority to impose a development moratorium interfering with the beneficial enjoyment of property rights pursuant to its police powers unless it demonstrates that it has acted in response to a dire necessity, that its action is reasonably calculated to alleviate or prevent the crisis condition, and that it is presently taking steps to rectify the problem.

308.    The Moratorium Law was not enacted in response to a dire necessity or crisis condition.

309.     The Town also lacked authority to impose a development moratorium interfering with the beneficial enjoyment of property rights pursuant to its zoning powers unless it demonstrated that the moratorium has a valid rational basis and is reasonably limited in duration.

310.     The Town's asserted public purpose for the Moratorium Law, i.e., updating its master plan and adopting zoning amendment in conformance therewith, was mere pretext to prevent the completion of housing, including the Projects, that would be available to Hasidic Jewish individuals and families, and did not provide a valid or rational basis to preclude all residential development in the Town, including the Projects.

311.     The Moratorium Law was not reasonably limited in duration.  Although the original development moratorium was enacted for a period of three months, the Moratorium Law was extended for six additional three-month periods, for a total development moratorium of more than a year and a half.

312.     The Moratorium Law did not contain any limitation on the number of times that it could be extended by the Town Board, and thus could have continued indefinitely.

313.     Furthermore, the Town only proposed revisions to its master plan and zoning code over a year after the Moratorium was first enacted.

314.     Thus, the Moratorium Law was not reasonably limited in duration.

315.     No risk to the health, safety, or welfare of the residents of the Town existed to support the adoption of the Moratorium Law.

316.     The Moratorium Law prevented Plaintiffs from obtaining the remaining ministerial approvals from the Town required for the signing of the Final Subdivision Plats for the Projects by the Chair of the Planning Board prior to the enactment of the Zoning Law Amendments.

317.     The Zoning Law Amendments impose a number of restrictions on Plaintiffs that will prevent the Projects from being constructed in accordance with the Approvals.   These changes include significantly reducing the lot counts for the Project Sites, as well as requiring the preparation of three new, separate, subdivision plans for each Project prior to the Planning Board making a determination on what type of subdivision applications Plaintiffs will even be permitted to pursue as well as numerous additional restrictions.

318.     Plaintiffs have been directly and compensably harmed by the actions of Defendants, set forth above.

319.     Plaintiffs have no adequate remedy at law for the harm and damage cause by Defendants' violation of their constitutional rights.

320.     Defendants have caused Plaintiffs to suffer irreparable harm, damage, and injury, and will continue to suffer such damages unless Defendants' acts and conduct complained of are permanently enjoined.

## AS AND FOR A SECOND CAUSE OF ACTION

### New York Constitution and Common Law

321.     Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

322.     Article I, § 6 of the New York State Constitution provides that "no person shall be deprived of life liberty or property without due process of law."

323.     Binding and settled decisional law from the New York State Court of Appeals and Appellate Division, Second Department, mandates that a moratorium on land use development, as well as issuance of land use approvals and permits, must be either: (a) a narrowly crafted response to an actual emergency or crisis condition; or (b) to preserve the status quo as to

projects without vested rights while a local law amending a locality's comprehensive plan or land use laws has been proposed for adoption (so-called "stop-gap" or "interim zoning").

324.     The Moratorium Law contained no findings that the Town faced any actual crisis or emergency of any kind.

325.     The purpose of the Moratorium Law was to freeze all significant residential development, including approved projects, while the Town studies its CMP and its land use laws to determine whether either or both require revision. The Moratorium Law referenced none and the Town Board only proposed amendments to the Town's land use laws or CMP over a year after the Moratorium was first adopted and following multiple three-month extensions of the Moratorium Law. Thus, the Moratorium Law was not interim or "stop-gap" zoning.

326.     Because there was no crisis or emergency facing the Town and no proposed amendment of its land use laws at the time the Moratorium Law was adopted, the Moratorium Law had no legal basis and was facially invalid.

327.     The Moratorium Law was also illegally adopted solely as a pretext to assuage strident community opposition led by United Monroe against making housing in the Town available to the Hasidic Jewish community, in violation of the New York Constitution and common law.

328.     The Moratorium Law prevented Plaintiffs from obtaining the remaining ministerial approvals form the Town required for the signing of the Final Subdivision Plats by the Town Planning Board Chair prior to the enactment of the Zoning Law Amendments.

329.     The Zoning Law Amendments impose a number of restrictions on Plaintiffs that will prevent the Projects from being constructed in accordance with the Approvals.  These changes include significantly reducing the lot counts for the Project Sites, as well as requiring the

preparation of three new, separate, subdivision plans for each Project prior to the Planning Board making a determination on what type of subdivision applications Plaintiffs will even be permitted to pursue as well as numerous additional restrictions.

330.    Plaintiffs have suffered irreparable harm, damage, and injury as a result of the adoption of the Moratorium Law, and will continue to suffer such harm unless the enforcement of the Zoning Law Amendments is permanently enjoined.

331.    Accordingly, Plaintiffs request a declaratory judgment adjudging the Moratorium Law to be null, void, and of no force and effect on its face, as well as a permanent injunction preventing the Town from adopting such an illegal Moratorium in the future.  Plaintiffs also seek a declaratory judgment that the Zoning Law Amendments are null, void, and of no force and effect as applied to Plaintiffs and a permanent injunction preventing the Town or any of its officials or boards, from applying or enforcing the Zoning Law Amendments against Plaintiffs or the Projects.

## AS AND FOR A THIRD CAUSE OF ACTION

### U.S. Constitution, Fourteenth Amendment
### 42 U.S.C. § 1983

332.    Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

333.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o state shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws."

334.    Defendants have taken numerous unlawful actions to prevent final approval and construction of the Projects, including but not limited to the intentional refusal to review and

approve the PISAs and letters of credit, adoption of the Moratorium Law, and adoption of the Zoning Law Amendments.

335.    Defendants have taken these unlawful measures based upon their discriminatory animus targeted against Hasidic Jews.

336.    Defendants McGinn and Cardone entered office pursuant to an anti-Hasidic platform to "take back our Town" from Hasidic Jewish interests and the Kiryas Joel Power Elite, and have received support from United Monroe, an anti-Hasidic organization.

337.    With the enactment of the Moratorium Law, Defendants sought and succeeded to prevent further progress on the Projects, adversely affecting Plaintiffs' ability to proceed with construction and the sale of the properties.

338.    The Town's denial of Plaintiffs' Exemption/Variance Applications further prevented Plaintiffs from making further progress on the Projects.

339.    The Moratorium Law and the Town's denial of the Exemption/Variance Applications prevented Plaintiffs from obtaining the remaining ministerial approvals from the Town required by the Approvals and the signing of the Final Subdivision Plats by the Chair of the Planning Board prior to the enactment of the Zoning Law Amendments.

340.    The Zoning Law Amendments significantly reduce the allowable density in most areas of the Town, including on the Project Sites.

341.    Defendants' laws and actions deprived and continue to deprive Plaintiffs of their right to equal protection of the laws.

342.    Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' violation of their constitutional rights.

343.    Defendants have caused Plaintiffs to suffer, and to continue to suffer, irreparable harm, damage, and injury.  Plaintiffs will continue to suffer such harm unless Defendants' laws and acts complained of are permanently enjoined.

## AS AND FOR A FOURTH CAUSE OF ACTION

### Fair Housing Act
### 42 U.S.C. § 3604

344.    Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

345.    Defendants, by their continuing conduct, acts, and legislative enactments that prevent the final approval, construction, sale, and use of the Plaintiffs' projects, have intentionally discriminated against Plaintiffs by making housing "unavailable" within the Town of Monroe on the basis of religion in violation of 42 U.S.C. § 3604.

346.    By enacting the Moratorium Law preventing the signing of the final approved subdivision plat for the Polak Farms and Shea Meadow projects, grant of final subdivision approval for the Eagle Ridge Estates project, the grant of preliminary and final subdivision approvals for the Rye Hill Estates project, and the issuance of any land clearing or building permits for the projects, including outside of the Town's municipal jurisdiction in the Village of Monroe, Defendants have precluded Hasidic Jewish individuals from moving into the Town by virtue of preventing construction and completion of the Project, and other projects in the Rye Hill Corridor of the Town.

347.    Since the Moratorium Law was effective for 90 days, and could be extended indefinitely, the Moratorium Law effectively kept Hasidic Jewish residents out of the Town for an indefinite period of time by simply refusing to sign the Projects' approved final subdivision

plats and issue any building permits therefor prior to the enactment of the Zoning Law Amendments.

348.    The Moratorium Law was extended on six instances following its adoption on April 26, 2016.

349.    Defendants, through adoption of the Moratorium Law (Town Local Law No. 1 of 2016) and the six extension local laws (Local Law Nos. 2 and 4 of 2016 and Local Law No. 1, 3, 4, and 5 of 2017), the Accessory Apartment Amendment Local Law, the Zoning Law Amendments, and the proposed LLC Disclosure Local Law, have openly discriminated against the Hasidic Jewish residents of Monroe and the surrounding areas in Orange County on account of their religion by prohibiting the development of the Projects that would provide housing with all of the necessary religious requirements, such as Kosher kitchens and livable square footage large enough to accommodate Hasidic Jewish families.

350.    The election of Town officials who openly support United Monroe's cause shows a tacit approval of discrimination on the basis of religion within the community, and that the Town officials are now acting on behalf of their constituents to bar Hasidic Jewish individuals and families from building or moving into housing developments in the Town.

351.    Despite the fact that Plaintiffs have obtained all necessary approvals from the Town for the Polak Farms and Shea Meadow projects, except for the ministerial approval of the PISAs and Letter of Credits intentionally delayed by the Town Board as a part of the scheme to exclude housing that could accommodate the housing needs of Hasidic Jewish individuals and families, and have acquired vested rights in the Projects by constructing in reliance on lawfully granted approvals, the Moratorium Law prevented the signing of the Polak Farms and Shea

Meadow projects final approved subdivision plats and issuance of building permits for the projects.

352.    The Moratorium Law prevented Plaintiffs from obtaining the remaining ministerial approvals from the Town required by the Approvals and the signing of the Final Subdivision Plats by the Chair of the Town Planning Board prior to the enactment of the Zoning Law Amendments.

353.    The Zoning Law Amendments significantly reduce the permissible density for construction within the Town and further limit the construction of multi-family dwellings within the Town, which unlawfully impact Plaintiffs' Projects.

354.    The overwhelming animus towards Hasidic Jewish individuals and families has resulted in the disparate treatment of Hasidic Jews and Plaintiffs by Defendants.

355.    Defendants, except for Supervisor Doles and Planning Board Chairperson Schwartz, voted in favor of the Moratorium Law, and have instructed that Monroe ordinances and local laws be applied unfairly to prevent Hasidic Jewish individuals and families from moving into the Town.

356.    Defendants, except for Harley Doles, Gerard McQuade and Planning Board Chairperson Schwartz, voted in favor of the Zoning Law Amendments which, among other things, significantly decreased the maximum allowed lot coverage within the residential areas of the Town.

357.    Plaintiffs are aggrieved persons as that term is defined in the Fair Housing Act, 42 U.S.C. § 3602(i) and have suffered harm, damage, and injury as a result of Defendants' conduct.

358.    Plaintiffs have no adequate remedy at law for such harm, damage, and injury caused by Defendants' conduct.

359.    Defendants have cause Plaintiffs to suffer, and continue to suffer irreparable harm, damage, and injury, and Plaintiffs will continue to suffer such harm unless Defendants' acts and conduct complained of are permanently enjoined.

### AS AND FOR A FIFTH CAUSE OF ACTION

**Fair Housing Act**
**42 U.S.C. § 3617**

360.    Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

361.    Defendants, by their continuing conduct, acts, and legislative enactments that prevent the approval, construction, and use of the Projects, have intentionally discriminated against Plaintiffs on account of their having exercised rights, or having aided or encouraged other persons to engage in the exercise or enjoyment of rights that are granted or protected by 42 U.S.C. § 3604, in violation of 42 U.S.C. § 3617.

362.    As a direct result of these unlawful actions by Defendants, even though the Polak Farms and Shea Meadow projects received all of their final land use approvals, except for those intentionally delayed by the Town Board as a part of its discriminatory scheme, the Town has repeatedly discriminated against the development and thereby has intentionally interfered with the Hasidic Jewish communities' right to available housing.  Defendants have further sought to coerce and intimidate those who support the Hasidic Jewish community in the hopes of preventing the development of appropriate housing for the community.

363.    As discussed above, Defendants have taken numerous steps to interfere with Plaintiffs' exercise and enjoyment of fundamental rights.

364.    Plaintiffs are aggrieved persons as that term is defined in the Fair Housing Act, 42 U.S.C. § 3602(i) and have suffered harm, damage, and injury as a result of Defendants' conduct.

365.    Plaintiffs have no adequate remedy at law for such harm, damage, and injury caused by Defendants' conduct.

366.    Defendants have caused Plaintiffs to suffer irreparable harm, damage, and injury, and Plaintiffs will continue to suffer such harm unless Defendants' acts and conduct complained of are permanently enjoined.

## AS AND FOR A SIXTH CAUSE OF ACTION

### U.S. Constitution, Fourteenth Amendment
### New York Constitution
### Due Process of Law

367.    Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

368.    The Due Process Clauses of the U.S. and New York Constitutions prohibit the deprivation of vested property rights through unlawful government actions.

369.    The Moratorium Law and Zoning Law Amendments are unconstitutional as applied to Plaintiffs because Plaintiffs' property rights have vested and the Moratorium Law is unlawful on its face.

370.    Even if not unlawful on its face, the Moratorium Law and Zoning Law Amendments cannot lawfully be applied to Plaintiffs and the Projects because Plaintiffs have constitutionally protected vested rights in the permits and approvals issued for the Projects.

371.    Under New York State law, property rights in lawfully issued permits and approvals vest once the property owner or permit holder has undertaken substantial construction and or otherwise made substantial expenditures in reliance on the lawfully issued permits and approvals.

372. Plaintiffs have been lawfully issued the Approvals, multiple additional State, County and Local discretionary approvals for the Projects, multiple additional ministerial approvals, and have expended millions of dollars in reliance upon all of the permits and approvals for the Projects. Plaintiffs' expenditures have been made in significant part to construct Project Improvements, Mitigation Measures, and Off-Site Improvements that are required as conditions of the project approvals.

373. Plaintiffs' property rights in all of the approvals they have received for the Projects have vested.

374. The Moratorium Law unlawfully deprived Plaintiffs of their vested property rights in violation of the Due Process Clauses of the U.S. and New York Constitutions, and as such Plaintiffs seek a declaratory judgment that the Moratorium Law was null, void, and of no force and effect as applied to Plaintiffs.

375. The Zoning Law Amendments unlawfully deprive Plaintiff of its vested property rights in violation of the Due Process Clauses of the U.S. and New York Constitutions, and as such Plaintiffs seek a declaratory judgment that the Zoning Law Amendments are null, void, and of no force and effect as applied to Plaintiffs. Plaintiffs also seeks a permanent injunction preventing the Town or any of its officials or boards, from applying enforcing the Zoning Law Amendments against Plaintiffs or the Projects.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### U.S. Constitution, Fourteenth Amendment
### 42 U.S.C. § 1983

376. Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

377.    Title 42, Section 1983 of the U.S. Code provides that any person who, under color of state law, deprives a person of federal constitutional or statutory rights will be liable to the injured party.

378.    The Due Process Clauses of the U.S. and New York Constitutions prohibit the unlawful deprivation of vested property rights.

379.    The denial of Plaintiffs' Exemption/Variance Applications is unconstitutional because Plaintiffs' property rights have vested and the deprivation of those rights through the denial of Plaintiffs' Exemption/Variance Applications were arbitrary, capricious, and contrary to law.

380.    The Town Board's vote to deny Plaintiffs' Exemption/Variance Applications was arbitrary because there is no evidence in the record that Plaintiffs' rights had not vested, that Plaintiffs will not suffer financial hardship as a result of the Moratorium, or that there is any lawful basis for the Moratorium Law. In addition, the Town Board failed to identify any evidence, find any facts, or make any conclusions of law that would support its denial of the Exemption/Variance Applications.

381.    The 8/26/16 Barshov Letter to the Town Board afforded the Town Board clear written advance notice that Plaintiffs rights had vested, that failure to exempt Plaintiffs from the Moratorium Law would violate their constitutionally protected rights, and that denial of the Exemption/Variance Applications would subject Town Board members who voted in favor of denial to official and individual liability for damages and attorney's fees pursuant to 42 U.S.C. §§ 1983 and 1988. Despite this notice, Respondents-Defendants Cardone, McGinn, and McQuade voted to deny Plaintiffs Variance Applications.

382.    The denial of Plaintiffs' Exemption/Variance Applications, under color of state law, arbitrarily deprived Plaintiffs of their vested property rights in violation of the Due Process Clause of the U.S. Constitution, the Due Process Clause of the New York Constitution, and 42 U.S.C. § 1983.

383.    The Moratorium Law and denial of the Exemption/Variance Applications prevented Plaintiffs from obtaining the remaining ministerial approvals from the Town required for the signing of the Final Subdivision Plats by the Chair of the Planning Board prior to the enactment of the Zoning Law Amendments.

384.    Accordingly, Plaintiffs seek an award of damages for each day that the illegal moratorium remained in force against the Projects and the Project Sites, and for each date that the Zoning Law Amendments are applied to Plaintiffs and the Projects, plus such additional sums as will be established at trial to compensate Plaintiffs for their monetary injuries and losses.

385.    In addition, Plaintiffs seek an award of reasonable attorneys' fees, as well as costs and expenses of litigation under 42 U.S.C. § 1988.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

### Exclusionary Zoning as to Accessory Apartments

386.    Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

387.    The Accessory Apartments Law restricts the use of accessory apartments in a manner that will disproportionately affect Hasidic Jews who live in the Town.

388.    The Accessory Apartment Law is designed to exclude Hasidic Jews from the Town.

389.    Defendants have failed to provide a properly balanced and well-ordered plan for the Town by failing to provide a sufficient mix of low, medium, and higher density development adequate to meet the housing needs of all Town residents, including the Town's Hasidic Jewish population, and the demonstrated affordable housing needs in the Southern Orange County region.

390.    The Orange County Comprehensive Plan identifies the Village of Kiryas Joel and the areas immediately adjacent thereto, including lands in the Villages of Harriman, Monroe, South Blooming Grove, and Woodbury, as a priority growth area in which development should be concentrated.

391.    The Orange County Comprehensive Plan and the three-county study of affordable housing also note that the County and the municipalities surrounding Kiryas Joel are experiencing a shortage of affordable housing, including higher density and multifamily development.

392.    The Accessory Apartment Law arbitrarily and discriminatorily restricts the availability of affordable housing in the Town, which will only exacerbate the shortage of such housing in the surrounding region.

393.    In precluding for at least 10 years affordable accessory apartments to be built in the Town, and only permitting accessory apartments that are patently insufficient to meet the needs of the local and regional Hasidic Jewish population, the Accessory Apartment Law ignores the regional housing needs identified in the Orange County Comprehensive Plan and the three-county study of affordable housing and fails to properly balance the Town's desire to maintain the status quo and the greater public interest that regional housing needs be met.

394.    The restrictions placed on accessory apartments in the Town by the Accessory Apartment Law, including, but not limited to, the restriction on the square footage of accessory apartments, and the requirement that residences with accessory apartments be owner-occupied effectively limit the availability of higher density and multifamily development to single individuals and small families.

395.    These density restrictions and restrictions imposed by the Accessory Apartment Law also effectively preclude the local and regional Hasidic Jewish population from residing in any of the Town's permitted higher density housing, as their religious and cultural practices generally result in them having large families that prevent occupancy of apartments of the size permitted by the Accessory Apartments Law.

396.    The Accessory Apartments Law also denied benefits to entities such as Plaintiffs by limiting the grant of accessory apartments to owner-occupied properties thereby discriminating against landlords, as well as corporations and limited liability companies that own property as they cannot occupy that property without any rational basis for doing so.

397.    The average household size of Hasidic families is approximately 6 persons per household, with many families having at least six children per household, often containing multiple generations under one roof.

398.    Thus, the accessory apartments limitations were also clearly intended to preclude Hasidic Jewish families, which typically live in larger family units, according to their religious and cultural practices.

399.    As identified in the Orange County Comprehensive Plan, and the three-county study on affordable housing, the local and regional needs for affordable housing are not currently

being met by the Town or the surrounding municipalities.  The needs anticipated by these studies clearly include the affordable housing needs of the local and regional Hasidic Jewish community.

400.    The Accessory Apartment Law was adopted without regard to the local and regional housing needs identified in the Orange County Comprehensive Plan and the three-county study on affordable housing.

401.    Because the restrictions contained in the Accessory Apartment Law have no substantial relation to the public health, safety, morals, or general welfare, and were either enacted with an exclusionary purpose or without regard to local and regional housing needs and will have an exclusionary effect, they constitute unlawful and unconstitutional exclusionary zoning.

402.    Defendants' exclusionary zoning practices have caused Plaintiffs' to suffer irreparable harm, damage, and injury and have placed a greater disproportionate burden on the Hasidic Jewish community to find affordable housing in the surrounding communities.

403.    Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' unconstitutional exclusionary zoning.

404.    Thus, this Court should declare the Accessory Apartment Law to be unconstitutional exclusionary zoning and enjoin Defendants from using their zoning authority to purposefully or effectively exclude Hasidic Jewish residents from the Village.

### AS AND FOR AN NINTH CAUSE OF ACTION

### Exclusionary Zoning as to the Zoning Law Amendments

405.    Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

406.    The Zoning Law Amendments drastically reduce the permitted density in residential areas of the Town as well as restricting those areas of the Town where multi-family housing is permitted.

407.    The Zoning Law Amendments are designed to exclude Hasidic Jews from the Town.

408.    Defendants have failed to provide a properly balanced and well-ordered plan for the Town by failing to provide a sufficient mix of low, medium, and higher density development adequate to meet the housing needs of all Town residents, including the Town's Hasidic Jewish population, and the demonstrated affordable housing needs in the Southern Orange County region.

409.    The Orange County Comprehensive Plan identifies the Village of Kiryas Joel and the areas immediately adjacent thereto, including lands in the Villages of Harriman, Monroe, South Blooming Grove, and Woodbury, as a priority growth area in which development should be concentrated.

410.    The Orange County Comprehensive Plan and the three-county study of affordable housing also note that the County and the municipalities surrounding Kiryas Joel are experiencing a shortage of affordable housing, including higher density and multifamily development.

411.    The Zoning Law Amendments arbitrarily and discriminatorily restricts the availability of affordable housing in the Town, which will only exacerbate the shortage of such housing in the surrounding region.

412.    As identified in the Orange County Comprehensive Plan and the three-county study of affordable housing, the local and regional needs for affordable housing are not currently

being met by the Town or the surrounding municipalities.  The needs anticipated by these studies clearly include the affordable housing needs of the local and regional Hasidic Jewish community.

413.    The Zoning Law Amendments were adopted without regard to the local and regional housing needs identified in the Orange County Comprehensive Plan and the three-county study on affordable housing.

414.    Because the density restrictions contained in the Zoning Amendments Law have no substantial relation to the public health, safety, morals, or general welfare, and were either enacted with an exclusionary purpose or without regard to local and regional housing needs and will have an exclusionary effect, they constitute unlawful and unconstitutional exclusionary zoning.

415.    Defendants' exclusionary zoning practices have caused Plaintiffs' to suffer irreparable harm, damage, and injury and have placed a greater disproportionate burden on the Hasidic Jewish community to find affordable housing in the surrounding communities.

416.    Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' unconstitutional exclusionary zoning. Thus, this Court should declare the Accessory Apartment Law to be unconstitutional exclusionary zoning and enjoin Defendants from using their zoning authority to purposefully or effectively exclude Hasidic Jewish residents from the Town.

## AS AND FOR A TENTH CAUSE OF ACTION

### U.S. Constitution, Fourteenth Amendment
### 42 U.S.C. § 1985(3)

417.    Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

418.    By way of their conduct as set forth in this Complaint, and acting under color of state law, Defendants have conspired, and continue to conspire, to deprive Plaintiffs, and others similarly situated, of the equal protection of the laws, as guaranteed by the Fourteenth Amendment to the United States Constitution, on the basis of their religious beliefs and practices and acts to facilitate the availability of housing in the Town that could be occupied or purchased by the Hasidic Jewish community.

419.    Defendants have engaged in a concerted scheme carried out by political allies, including but not limited to Defendants Cardone and McGinn, who are alleged to be involved with or supported by United Monroe, and the Town Board under their control to engage in a pervasive and wide-ranging scheme to keep the Hasidic Jewish community out of the Town.

420.    Defendants have sought to use their laws and actions to deprive Plaintiffs of equal protection of the law and have taken actions against members of the Hasidic Jewish religion, including the refusal to sign the final approved subdivision plats for the Polak Farms and Shea Meadow projects, grant final subdivision approval for the Eagle Ridge Estates project, grant preliminary and final subdivision approval for the Rye Hill Estates project, grant building permits and land clearing permits for the Projects, and allow construction to proceeding in accordance with the approvals granted by the Town Planning Board.

421.    Defendants have also sought to use their laws and actions to deprive Plaintiffs of equal protection of the law and have taken additional actions against members of the Hasidic Jewish community by adopting the Accessory Apartment Law limiting the size of the accessory apartments that are permitted in a direct attempt to prevent Hasidic Jewish families from utilizing the Accessory Apartments.

422.    Additionally, Defendants have deprived Plaintiffs of equal protection of the law by limiting the benefits granted under the Accessory Apartment Law to owner occupied properties.  This unreasonably discriminates against landlords, corporations, and limited liability companies, such as Plaintiffs, who cannot occupy the property without providing any rational basis for the limitation.

423.    Further, upon information and belief, Defendants conspired to remove the Chairperson of the Town Planning Board for issuing approvals for the Projects and others that could make housing available for the Hasidic Jewish community.

424.    Together, Defendants, by their actions, seek to disenfranchise and prevent the construction of projects, such as Plaintiffs', that could make housing available to the Hasidic Jewish community, while at the same time allowing non-Jewish-owned single-family housing to be constructed in the Town.

425.    Defendants, as officers of the Town, plainly take action against Jewish-owned properties as a result of their positions within the community and at the direction of or upon the influence of United Monroe.

426.    The election of Defendants Cardone and McGinn who openly support United Monroe's cause shows tacit approval of discrimination on the basis of religion, which interferes with the rights of Town residents – and potential Town residents – to exercise their right to build or move into housing developments in the Town.

427.    Defendants have provided support to the discriminatory efforts of United Monroe and have acted in furtherance of the conspiracy to abridge Plaintiffs' civil rights.  For example, upon the election of United Monroe-backed candidates Defendants Cardone and McGinn, the Town Board followed through on United Monroe's campaign promises to halt construction in

the Town, revisit the Town's zoning, and substantially limit the Town's accessory apartment provision.

428.    Defendants have caused Plaintiffs to suffer, and to continue to suffer, irreparable harm, damage, and injury, as set forth in detail above.  Plaintiffs will continue to suffer such damages unless Defendants' acts and conduct complained of are permanently enjoined.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION

### Unconstitutional Taking Based on Failure to Advance Legitimate Public Purpose and Causing a Severe Economic Impact

429.    Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

430.    The Accessory Apartments Law does not substantially advance a legitimate public purpose, because the requirement that the owner of the property applying for a permit for an accessory apartment have resided in the property for ten years bears no reasonable relationship to a legitimate public purpose.

431.    With respect to the adoption of the Accessory Apartments Law the Town has failed to set forth:

a.  How the Town came to the determination that the governmental interests were not adequately protected by the then current restrictions on accessory apartments;

b.  How the Town evaluated what the adequate protection should be.

432.    The record for adoption of the Accessory Apartments Law is devoid of evidence that demonstrates that the Town considered what the proper level of zoning protection was, or that the Town considered whether the adoption of the Accessory Apartments Law and the restrictions therein on occupation for ten years as a single-family residence and/or owner-occupation of the main dwelling served a legitimate public purpose.

433.    The Zoning Law Amendments does not substantially advance a legitimate public purpose, because the reduction in allowable density of construction on the Project Sites bears no reasonable relationship to a legitimate public purpose.

434.    With respect to the adoption of the Zoning Law Amendments, the Town has failed to set forth:

      a.   How the Town came to the determination that the governmental interests were not adequately protected by the then current zoning law's application to the Project Sites;

      b.   How the Town evaluated what the zoning restrictions should be on the Project Sites.

435.    The record for adoption of the Zoning Law Amendments is devoid of evidence that demonstrates that the Town considered what the proper level of zoning protection was for the Project Sites, or whether the zoning law restrictions imposed on the Project Sites served a legitimate public purpose.

436.    The adoption of the Zoning Law Amendments and the subsequent reduction in density for the Project Sites only occurred after the Planning Board adopted the Approvals, and the express determinations contained therein that the Projects would substantially serve the public convenience, safety and welfare and would not be detrimental to the neighborhood or the residents thereof.

437.    The Zoning Law Amendments and the Accessory Apartments Law are an unconstitutional regulatory taking of the Plaintiffs' land because the Zoning Law Amendments and the Accessory Apartments Law have caused the Plaintiffs to suffer a severe economic impact and interference with the Plaintiffs' reasonable investment-backed expectations by allocating to the Plaintiffs an economic burden that should be borne by the public at large.

438.    The Accessory Apartments Law is an unconstitutional regulatory taking by the Town, because the restrictions set forth therein bear no reasonable relationship to a legitimate public purpose and have caused the Plaintiffs to incur a severe economic impact in interference with the Plaintiffs' reasonable investment-backed expectations.

439.    The Zoning Law Amendments are an unconstitutional regulatory taking by the Town, because the restrictions set forth therein bear no reasonable relationship to a legitimate public purpose and have caused the Plaintiffs to incur a severe economic impact in interference with the Plaintiffs' reasonable investment-backed expectations.

**WHEREFORE**, Plaintiffs pray for the following relief:

A.    A judgment declaring that the Moratorium Law on its face was null, void, and of no force and effect, as well as a permanent injunction preventing the Town from adopting such an illegal Moratorium in the future;

B.    A declaratory judgment that the Moratorium Law was null, void, and of no force and effect as applied to Plaintiffs;

C.    A judgment annulling and vacating the denial of Plaintiffs' Exemption/Variance Applications;

D.    A judgment declaring the Accessory Apartment Law to be null, void, and of no force and effect;

E.    A judgment declaring the Zoning Law Amendments to be null, void, and of no force and effect as applied to Plaintiffs;

F.    An injunction and/or order of mandamus requiring the Town to issue the ministerial approvals and undertake the ministerial actions needed to enable Plaintiffs to continue their current and ongoing construction and installation of

89

Project Improvements, Mitigation Measures and Off-Site Improvements, including (i) approval of the PISAs and Letters of Credit; (ii) signing by the Town Planning Board Chair of the Approved Final Plats; and (iii) issuance of the land disturbance and clearing permit(s);

G.     An award of damages against all Defendants, except the Town Planning Board Chair, for the losses caused and expenses incurred by Plaintiffs arising from and in connection with the adoption of the Moratorium Law, its application to Plaintiffs and the Projects, the denial of the Exemption/Variance Applications, the adoption of the Zoning Law Amendments, its application to Plaintiffs and the Projects, the unlawful interference with and deprivation of Plaintiffs' vested constitutional rights, and the preclusion of Town officials and boards from issuing ministerial permits and approvals to which Plaintiffs are entitled, in an amount to be proven at trial;

H.     An award of reasonable attorneys' fees, costs and expenses of this litigation; and

I.     An award of such other relief as the Court deems appropriate.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. Pro. 38, Plaintiffs demands a jury trial on all issues so triable.


Dated: February 5, 2018                   WHITEMAN OSTERMAN & HANNA LLP
Albany, New York

By:      _s/ Robert S. Rosborough IV_____
John J. Henry, Esq. (JH 7137)
Robert S. Rosborough IV, Esq. (RR 5604)
Emily Perks Quinlan, Esq. (EQ 8208)
*Attorneys for Plaintiffs*
One Commerce Plaza
Albany, New York 12260
(518) 487-7600
(518) 487-7777 (facsimile)
jhenry@woh.com
rrosborough@woh.com
equinlan@woh.com